**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**PUBLISH**

## UNITED STATES COURT OF APPEALS

## FOR THE TENTH CIRCUIT
_____

**August 22, 2025**

**Christopher M. Wolpert**
**Clerk of Court**

JOHN KRUEGER, individually and as Co-Administrator of the Estate of Jeffery Krueger; PAMELA KRUEGER, individually and as Co-Administrator of the Estate of Jeffery Krueger,

      Plaintiffs - Appellees,

v.

KALEB PHILLIPS, individually; NICHOLAS ORR, individually; MATTHEW LOTT, individually,

      Defendants - Appellants,

and

SHERIFF CHRIS ELLIOTT, in his official capacity as Sheriff of Wagoner County; WAGONER EMERGENCY SERVICES, INC., a/k/a Wagoner EMS; JEFF PATTERSON, individually; ALAN SMITH, individually; DREW CRAIG, individually; TYLER MCFARLAND, individually; COREY NEVITT, individually; CLARENCE COLLINS, individually; TRAVIS POTTS, individually; BEN BLAIR, individually; ELIZABETH CROCKETT, individually,

      Defendants.

_____

No. 24-7035

JOHN KRUEGER, individually and as Co-Administrator of the Estate of Jeffery Krueger; PAMELA KRUEGER, individually and as Co-Administrator of the Estate of Jeffery Krueger,

     Plaintiffs - Appellees,

v.

DREW CRAIG, individually;
TYLER MCFARLAND, individually;
COREY NEVITT, individually;
BEN BLAIR, individually,

     Defendants - Appellants,

and

SHERIFF CHRIS ELLIOTT, in his official capacity as Sheriff of Wagoner County; WAGONER EMERGENCY SERVICES, INC., a/k/a Wagoner EMS; KALEB PHILLIPS, individually; NICHOLAS ORR, individually; JEFF PATTERSON, individually; ALAN SMITH, individually; CLARENCE COLLINS, individually; TRAVIS POTTS, individually; MATTHEW LOTT, individually; ELIZABETH CROCKETT, individually,

     Defendants.

No. 24-7037

_____

JOHN KRUEGER, individually and as Co-Administrator of the Estate of Jeffery Krueger; PAMELA KRUEGER, individually and as Co-Administrator of the Estate of Jeffery Krueger,

     Plaintiffs - Appellees,

v.

No. 24-7066

2

ELIZABETH CROCKETT, individually,

       Defendant - Appellant,

and

SHERIFF CHRIS ELLIOTT, in his official capacity as Sheriff of Wagoner County; WAGONER EMERGENCY SERVICES, INC., a/k/a Wagoner EMS; KALEB PHILLIPS, individually; NICHOLAS ORR, individually; JEFF PATTERSON, individually; ALAN SMITH, individually; DREW CRAIG, individually; TYLER MCFARLAND, individually; CLARENCE COLLINS, individually; COREY NEVITT, individually; TRAVIS POTTS, individually; BEN BLAIR, individually; MATTHEW LOTT, individually,

       Defendants.

_____

**Appeals from the United States District Court
for the Eastern District of Oklahoma
(D.C. No. 6:21-CV-00044-RAW)**

_____

John H. Kim, Pierce Couch Hendrickson Baysinger & Green, LLP, Oklahoma City, Oklahoma (Randall J. Wood, Robert S. Lafferrandre, and Jeffrey C. Hendrickson, with him on the briefs), for Defendants-Appellants Kaleb Phillips, Nicholas Orr, and Matthew Lott.

Thomas A. Le Blanc, Best & Sharp, Tulsa, Oklahoma (Matthew B. Free with him on the briefs), for Defendants-Appellants Drew Craig, Tyler McFarland, Corey Nevitt, and Ben Blair.

Stephen L. Geries, Collins Zorn & Wagner, PLLC, Oklahoma City, Oklahoma, for Defendant-Appellant Elizabeth Crockett.

Christopher E. Kemmitt, NAACP Legal Defense and Educational Fund, Inc., Washington, D.C. (Janai Nelson, Samuel Spital, Alaizah Koorji, Elizabeth Caldwell,

Kimberly Saltz, NAACP Legal Defense and Educational Fund, Inc., New York, New York; and Mark D. Lyons, Lyons & Clark, Inc., Tulsa, Oklahoma, with him on the brief), for Plaintiffs-Appellees.

_____

Before **HARTZ**, **McHUGH**, and **MORITZ**, Circuit Judges.

_____

**McHUGH**, Circuit Judge.

_____

Jeffrey Krueger died following a traffic stop in Oklahoma, initiated by Wagoner County Sheriff's Office ("WCSO") Deputies. Mr. Krueger's parents and the representatives of his estate, Plaintiffs-Appellees John and Pamela Krueger (the "Estate"), filed suit under 42 U.S.C. § 1983, alleging that multiple law enforcement officers used excessive force or else failed to intervene in the use of excessive force by others during the traffic stop, in violation of the Fourth Amendment.

The alleged force took place in two parts. First, WCSO Deputies Nicholas Orr and Kaleb Phillips initiated a traffic stop of Mr. Krueger's vehicle. After Mr. Krueger stopped his car in a middle turn lane rather than pulling onto the side of the road, the Estate alleges that Deputies Orr and Phillips pulled Mr. Krueger from his car by his hair, slammed his head on the pavement, and repeatedly tased him as they sought to place him in handcuffs. Second, Lieutenant Elizabeth Crockett and Deputy Matthew Lott of the WCSO, together with City of Wagoner Police Officers Ben Blair, Drew Craig, Tyler McFarland, and Corey Nevitt responded to the scene.[1] The Estate further

_____

[1] This court procedurally consolidated Appeal Nos. 24-7035, 24-7037, and 24-7066, given that they all arise from the same proceeding in the United States

4

claims that each officer either participated directly or failed to intervene when other officers put weight on the handcuffed and prone Mr. Krueger while also restraining him with leg shackles and a hobble tie. Mr. Krueger stopped breathing at the scene and was transported to a nearby hospital where he was pronounced dead.

The Defendants moved individually for summary judgment, asserting they were entitled to qualified immunity. The district court denied the Defendants' motions for summary judgment as to the Estate's excessive force and failure to intervene claims, determining that the facts viewed in the light most favorable to the Estate were sufficient to show clearly established constitutional violations. The Defendants filed the instant interlocutory appeals, arguing the district court was wrong to deny qualified immunity.

We agree with the district court that the Defendants are not entitled to qualified immunity on the excessive force and failure to intervene claims. Accordingly, we affirm the district court's orders denying summary judgment.

Our analysis of the issues on appeal proceeds in five parts. In Part I, we explain our limited jurisdiction over these interlocutory appeals, including three doctrines that expand the scope of that review. In Part II, we perform our obligation to conduct a cumbersome review of the record to supplement or correct the district

---

District Court for the Eastern District of Oklahoma. We collectively refer to the eight Defendants-Appellants party to this consolidated appeal as the "Defendants." The Estate sued other individuals and entities, but those claims and parties are not at issue in this appeal.

5

court's statement of facts and set forth the facts a reasonable jury could find based on that record evidence. In Part III, we provide the legal framework applicable to this appeal, including the standard of review and the law of qualified immunity. Then, in Part IV, we apply the facts as determined in Part II to the law set forth in Part III to assess the correctness of the district court's decision. Finally, in Part V, we summarize our conclusions.

Ultimately, we conclude that although the district court's recitation of the facts was incomplete and, in some instances, not stated in the light most favorable to the Estate, the court reached the correct conclusion: Defendants are not entitled to qualified immunity. We therefore affirm the district court's denials of summary judgment.

## PART I: JURISDICTION

The district court had subject matter jurisdiction over the Estate's 42 U.S.C. § 1983 claims under 28 U.S.C. § 1331 because they arose under federal law, and it had supplemental jurisdiction over the related state law claims under 28 U.S.C. § 1367.

Defendants filed timely interlocutory appeals of the denial of their motions for summary judgment based on qualified immunity. Pursuant to the collateral order doctrine, we have jurisdiction over their interlocutory appeals under 28 U.S.C. § 1291. *See, e.g.*, *Mitchell v. Forsyth*, 472 U.S. 511, 528 (1985); *Flores v. Henderson*, 101 F.4th 1185, 1190 (10th Cir. 2024). In this interlocutory posture, our appellate jurisdiction is generally limited to a review of the purely legal question of

the application of law to the district court's factual findings. *See, e.g.*, *Flores*, 101 F.4th at 1190. That is, we may review only "(1) whether the facts that the district court ruled a reasonable jury could find would suffice to show a legal violation, or (2) whether that law was clearly established at the time of the alleged violation." *Est. of Booker v. Gomez*, 745 F.3d 405, 409 (10th Cir. 2014) (quotation marks omitted). We lack interlocutory jurisdiction to review "whether or not the pretrial record sets forth a 'genuine' issue of fact for trial." *Johnson v. Jones*, 515 U.S. 304, 320 (1995). "Thus, if a district court concludes that a reasonable jury could find certain specified facts in favor of the plaintiff, the Supreme Court has indicated we usually must take them as true—and do so even if our own de novo review of the record might suggest otherwise as a matter of law." *Booker*, 745 F.3d at 409–410 (internal quotation marks omitted).

There are exceptions to this jurisdictional rule, however, and the parties urge us to expand the scope of our appellate review based on those doctrines. We now consider the exceptions advanced by the parties and determine whether any is applicable here.

### A.    *Material Facts Not Found*

First, "if a district court fails to specify which factual disputes precluded a grant of summary judgment for qualified immunity . . . we are unable to separate an appealed order's reviewable determination (that a given set of facts violates clearly established law) from its unreviewable determination (that an issue of fact is genuine)." *Id.* at 410 (internal quotation marks omitted). In this circumstance, "we

7

'may have to undertake a cumbersome review of the record to determine what facts the district court, in the light most favorable to the nonmoving party, likely assumed.'" *Id.* (quoting *Johnson*, 515 U.S. at 319). In undertaking this review, we "look behind the order denying summary judgment and review the *entire* record, including video evidence." *Id.* (internal quotation marks omitted). But if the district court indicates which sources in the record it relied on in determining facts were disputed, "our review [is] less cumbersome" because we can assume the district court relied on those sources in determining the factual disputes that "were material and disputed." *Id.*

Here, both the City of Wagoner Police Officers (the "City Defendants") and the Estate assert that a "cumbersome review" of the record is needed. The district court denied summary judgment as to the excessive force and failure to intervene claims against Defendants in two written orders: one addressing the City Defendants' motions for summary judgment, and one addressing the WCSO Deputies' (the "County Defendants") motions. As we discuss in more detail below, while the district court's orders generally specified which material facts precluded summary judgment, it omitted some facts we consider material.

The first deficiency in the factual recitation that requires us to undertake a de novo review of the record involves Deputies Phillips's and Orr's use of tasers following the removal of Mr. Krueger from his vehicle. The district court found "while it is undisputed that both Deputies Phillips and Orr struck Mr. Krueger and applied a taser, the number of strikes and taser applications is disputed." App. Vol.

8

VIII at 2111. But the district court did not make further findings specifying how many strikes and taser applications occurred when viewing the evidence in the light most favorable to the Estate. *See id.* The amount, duration, and strength of taser output are material facts under our excessive force precedent. *See, e.g.*, *Booker*, 745 F.3d at 424 (holding force was excessive when the defendant used taser "for three seconds longer than recommended"); *Perea v. Baca*, 817 F.3d 1198, 1204 (10th Cir. 2016) (holding force was excessive where "[t]he officers tasered [the plaintiff] once in 'probe mode' and nine times in 'stun mode' within the span of two minutes, continuing after [the plaintiff] had been effectively subdued"). Accordingly, we "'undertake a cumbersome review of the record' to ferret out facts that the district court 'likely assumed'" in holding the number of strikes and taser applications constituted excessive force. *Fogarty v. Gallegos*, 523 F.3d 1147, 1154 (10th Cir. 2008) (quoting *Behrens v. Pelletier*, 516 U.S. 299, 313 (1996)).

Next, the circumstances surrounding the prone restraint of Mr. Krueger after his removal from the vehicle require further review of the record. The district court sets forth in sufficient detail the timeline of events, the identity of the Defendants who put weight on Mr. Krueger and where, and the nature of the restraints used. However, the district court's factual findings as to the City Defendants, Lieutenant Crockett, and Deputy Lott failed to identify the level of resistance Mr. Krueger exhibited throughout the encounter, or the level of control the Deputies had over Mr. Krueger, further requiring our cumbersome review of the record. *See, e.g.*, *Teetz ex rel. Lofton v. Stepien*, 142 F.4th 705, 723 (10th Cir. 2025) (explaining that

9

whether a suspect is "effectively subdued" at some point during an encounter is highly relevant to the excessive force analysis). Because understanding Mr. Krueger's level of resistance and the Defendants' control over him is key to the excessive force analysis, we must conduct "a cumbersome review of the record to determine what facts the district court, in the light most favorable to [the Estate], likely assumed" in determining the force was excessive. *Booker*, 745 F.3d at 410 (quoting *Johnson*, 515 U.S. at 319).[2]

Otherwise, we hew to the district court's factual findings as to the prone restraint as required at this stage of review.[3]

### B.     *Blatantly Contradicted by the Record*

Next, the parties urge us to reconsider factual findings made by the district court which they contend are blatantly contradicted by the record. "When the version of events the district court holds a reasonable jury could credit is blatantly contradicted by the record, this court does not accept that version of events but

---

[2] *See Est. of Booker v. Gomez*, 745 F.3d 405, 410 n.1 (10th Cir. 2014) ("[W]e take this opportunity to urge district courts to heed *Johnson*'s admonition to state the facts the court is assuming for purposes of resolving a summary-judgment based request for qualified immunity. Such a consistent course of action preserves the district court's institutional advantage, at this interlocutory stage, in determining the existence, or nonexistence, of a triable issue of fact." (quotation marks omitted)).

[3] In the fact-intensive realm of excessive force cases, making findings as to the level of resistance law enforcement officers face *throughout* an encounter, not just at the beginning, is necessary to properly analyze whether an officer's use of force is excessive under the totality of the circumstances. *See, e.g.*, *Teetz ex rel. Lofton v. Stepien*, 142 F.4th 705, 723 (10th Cir. 2025).

instead assesses the facts de novo." *Vette v. K-9 Unit Deputy Sanders*, 989 F.3d 1154, 1164 (10th Cir. 2021) (internal quotation marks omitted). "This standard is satisfied only when 'the version of events is so utterly discredited by the record that no reasonable jury could have believed' it, constituting 'visible fiction.'" *Id.* (quoting *Scott v. Harris*, 550 U.S. 372, 380–81 (2007)).

Here, the district court found that during the entire portion of the encounter between Deputy Orr, Deputy Phillips, and Mr. Krueger captured on the body camera footage, "Mr. Krueger continued to struggle, fight, and kick the Deputies." App. Vol. VIII at 2100–01. But body camera footage of the incident blatantly contradicts this factual finding. As detailed in the fact section below, the video reveals that for long portions of the encounter, Mr. Krueger was exhausted, not fighting back, and under the control of the Deputies. The video therefore renders "visible fiction" a finding that Mr. Krueger was fighting back during the entire portion of the encounter captured on the body camera. *Scott*, 550 U.S. at 381. We therefore must conduct our own de novo review of the record to determine the facts a reasonable jury could find regarding the duration and effectiveness of Mr. Krueger's resistance. *See Est. of Valverde v. Dodge*, 967 F.3d 1049, 1062–63 (10th Cir. 2020) (reviewing video evidence which blatantly contradicted district court's factual findings on interlocutory appeal); *Teetz*, 142 F.4th at 723 (explaining whether a suspect is effectively subdued and restrained is material to the excessive force analysis).

Similarly, the district court found that after their encounter with Mr. Krueger, Deputies Phillips and Orr "were talking to other officers and not looking back to see

11

what was happening with Mr. Krueger," and "did not observe what happened with Mr. Krueger until they heard an officer call out that he was not breathing." App. Vol. VIII at 2101. But another officer's body camera footage unmistakably shows that after the Deputies first walked away, they both returned to observe what was happening with Mr. Krueger as he was being subjected to the prone restraint and one of the officers asked for leg shackles. Again, we must assess the factual record in the light most favorable to the Estate in determining the facts a reasonable jury could find.

### C.    Legal Error En Route to Factual Determination

Finally, we must review a district court's factual findings on interlocutory review "if the district court commits *legal* error en route to a *factual* determination." *Pahls v. Thomas*, 718 F.3d 1210, 1232 (10th Cir. 2013). For example, in *Pahls*, when the district court failed to make necessary individualized findings as to each defendant's alleged constitutional violations, we reviewed the record de novo to enable us to properly consider the legal question. *Id.* at 1233–43. And in *Works v. Byers*, 128 F.4th 1156, 1162 (10th Cir. 2025), we reviewed the record de novo when the district court shifted the burden to the wrong party.

Here, the district court uncritically adopted the Deputies' version of events during a crucial portion of the encounter not captured by video—the beginning of the

stop when Deputies Orr and Phillips pulled Mr. Krueger from his car.[4] But the

district court was also required to "consider[] the physical evidence together with the

inconsistencies in the [Deputies'] testimony," bearing in mind that "since the victim

of deadly force is unable to testify, courts should be cautious on summary judgment

to ensure that the [Deputies are] not taking advantage of the fact that the witness

most likely to contradict [their] story . . . is unable to testify." *Pauly v. White*, 874

F.3d 1197, 1217–18 (10th Cir. 2017) (quoting *Abraham v. Raso*, 183 F.3d 279, 294

(3d Cir. 1999)). The district court could "not simply accept what may be a self-

serving account" by the Deputies without "also look[ing] at the circumstantial

evidence that, if believed, would tend to discredit the [Deputies'] story." *Id.* at 1218

(quoting *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994)). To be sure, "mere

speculation, conjecture, or surmise cannot defeat a summary-judgment motion," and

"attacks on the credibility" of an officer alone cannot create a factual issue

precluding summary judgment without evidence supporting a contrary narrative.

---

[4] On appeal, the Estate notes that Deputy Phillips could not explain why his body camera footage failed to record the entire encounter, and observes that "unlike most bodycam videos, [Deputy] Phillips's bodycam does not begin with 30 seconds of silent video, raising questions about whether part of the video is missing." Appellees' Br. at 80. But from our review of the record, the Estate never raised this issue before the district court. By raising a motion for spoliation sanctions, the Estate would have been able to ask the district court to employ the "substantial weaponry in [its] arsenal to shape the appropriate relief," including by "issu[ing] an adverse inference." *Helget v. City of Hays*, 844 F.3d 1216, 1225–26 (10th Cir. 2017) (internal quotation marks omitted). In the absence of any developed record as to the reason for the missing video, we can rely only on the Deputies' testimony and other circumstantial evidence supporting the Estate's version of events in setting out the facts during this portion of the encounter.

*Alcala v. Ortega*, 128 F.4th 1298, 1306 (10th Cir. 2025) (internal quotation marks omitted). Accordingly, we have explained that sources such as forensic evidence, conflicting officer testimony, and medical evidence can be sufficient to create a factual dispute with an officer's stated version of events. *See, e.g.*, *Est. of Smart v. City of Wichita*, 951 F.3d 1161, 1170 (10th Cir. 2020) (relying on forensic evidence, eyewitness testimony, and testimony from the decedent's longtime friend about his lack of gun ownership to reject an officer's contrary account that decedent was armed); *Est. of Harmon v. Salt Lake City*, 134 F.4th 1119, 1124–25 (10th Cir. 2025) (holding reasonable jury could discredit officer's testimony that decedent carried a knife because circumstantial evidence including conflicting testimony from other officer, inconclusive DNA evidence, and the fact officer did not warn other officers about a weapon supported plaintiffs' version of events); *Huff v. Reeves*, 996 F.3d 1082, 1088–89 (10th Cir. 2021) (crediting circumstantial evidence that officer meant to shoot plaintiff, including the nature and extent of plaintiff's gunshot injuries, despite officer's contrary testimony).

Here, we find several instances in which Deputy Phillips's and Deputy Orr's testimony is directly contradicted by video or physical evidence or is internally inconsistent as between initial investigatory interviews and later affidavits and depositions. The conflicting testimony and credibility concerns, in combination with circumstantial evidence supporting the Estate's version of events, required the district

14

court, at the summary judgment stage, to find those facts in favor of the Estate.[5] *See, e.g., Smart*, 951 F.3d at 1170. The district court's failure to do so was a "*legal* error en route to a *factual* determination," requiring us to review the record de novo to determine the facts for purposes of resolving the legal question at issue—whether the Deputies are entitled to qualified immunity. *Pahls*, 718 F.3d at 1232.

In short, this combination of errors requires us to review the factual record as to Deputies Phillips and Orr de novo. We do so now and set forth the facts in the light most favorable to the Estate.

## PART II: FACTS AND DISTRICT COURT DECISION

### *A.    Facts*

In setting forth the facts a reasonable jury could find,[6] we begin by describing Deputies Orr's and Phillips's removal of Mr. Krueger from the vehicle based on our de novo review of the record. We then relay the encounter with the remaining law enforcement officers, summarizing the district court's factual findings and conducting a cumbersome review of the record where the district court failed to make

---

[5] Although the qualified immunity *analysis* considers the facts from the point of view of a reasonable officer, district courts must heed the basic summary judgment standard of construing the underlying *facts* in the light most favorable to the nonmovant. *See Tolan v. Cotton*, 572 U.S. 650, 656–57 (2014).

[6] The narrative set forth herein consists of the facts a reasonable jury could find. For simplicity, we sometimes omit the qualification that the facts recounted are those "a reasonable jury could find" occurred. Although we conclude the jury could find these facts, we express no opinion as to what the jury will find after hearing all the evidence.

necessary factual findings concerning Mr. Krueger's level of resistance throughout the prone restraint.

**1.    Encounter Between Mr. Krueger and Deputies Phillips and Orr**

*a.    Initial Stop and Removal*

On the evening of July 1, 2019, at approximately 9:45 p.m., Deputy Orr stopped at a gas station in Wagoner, Oklahoma to refill his patrol car while on duty. As Deputy Orr stood at the gas pumps, he claimed to hear squealing tires. A car pulled in behind him and Mr. Krueger exited his car and started cleaning the windshield. Deputy Orr later stated Mr. Krueger did not appear to be driving at an excessive rate of speed based on the video footage from the gas station, but he nonetheless attributed the squealing tires to him.

Mr. Krueger had stopped on his way to his parents' home in Texas. He cleaned his windshield and got back into his car. Mr. Krueger then drove away from the gas station.

Believing Mr. Krueger might be intoxicated because he allegedly appeared to talk to himself at the gas pumps, Deputy Orr called Deputy Phillips, who was also on patrol. Deputy Orr used his personal cell phone to call Deputy Phillips, despite being on duty. Deputy Orr relayed to Deputy Phillips that he had observed a man in a dark-colored car who could possibly be driving under the influence. Deputy Orr asked Deputy Phillips to follow the car and pull the driver over. Deputy Orr testified that he wanted to "give [Deputy Phillips] th[e] opportunity" to "further his skills in DUI

enforcement." App. Vol. IV at 1035. Deputy Phillips had graduated from the police academy just a few months prior to the incident.

Soon after, Deputy Phillips informed Deputy Orr that he was following Mr. Krueger's car on the highway. Deputy Phillips reported that Mr. Krueger was driving fast and failing to stay in his lane, although he later testified he was not sure if Mr. Krueger was driving over the posted speed limit. Deputy Orr caught up to Deputy Phillips and drove behind him as Deputy Phillips turned on his emergency lights. Mr. Krueger pulled his car into the center turn lane of the highway and stopped. The Deputies pulled their patrol cars behind Mr. Krueger and stopped. Deputy Phillips could see Mr. Krueger moving around inside the car. Deputy Phillips exited his patrol car and drew his gun. In his deposition, Deputy Phillips could not identify a specific reason why deadly force was warranted other than Mr. Krueger's abrupt stop in the middle of the highway. Deputy Orr also exited his patrol car and approached Mr. Krueger's car.

Because Deputy Phillips's body camera does not capture this first part of the traffic stop, we recite the Deputies' post hoc accounts. According to their testimony, the Deputies gave a series of conflicting commands to Mr. Krueger, including to put his hands out the window, put his hands on the steering wheel, exit the vehicle, and

17

remain in the vehicle. Viewing these facts in the light most favorable to Mr. Krueger, he complied with the order to remain in his car and did not open the door.[7]

Mr. Krueger continued to search the interior of his car. Deputies Orr and Phillips both testified they could see he had a card in hand and appeared to be looking through a pile of papers, possibly for his insurance information or driver's license. The Deputies testified they could not see weapons in his car, had no reason to suspect Mr. Krueger was armed, and that Mr. Krueger did not say anything threatening. But the Deputies decided to remove Mr. Krueger from his car because he was ignoring their commands and continuing to search his car. By this point, each Deputy had his gun out and pointed at Mr. Krueger.

Across their post-incident interviews, affidavits, and depositions, Deputies Phillips and Orr provided shifting accounts of what happened after they opened Mr. Krueger's car door. In an interview with the Oklahoma State Bureau of Investigation ("OSBI") and a subsequent affidavit, Deputy Phillips stated that Mr. Krueger grabbed his left arm and later reached for his gun. At Deputy Phillips's deposition, he reiterated that Mr. Krueger "grabbed me and . . . tried to pull me into

---

[7] The Deputies both testified in their depositions that Mr. Krueger swung open the door, and Deputy Phillips testified the door opening contributed to his decision to draw his weapon. But in Deputy Orr's initial interview with state investigators about the incident, he stated that Deputy Phillips opened the door. Again, resolving these conflicting facts in the light most favorable to Mr. Krueger, as we must, we conclude Mr. Krueger did not open the door.

his vehicle," and later that Mr. Krueger "[g]rabbed my leg" and "grabbed my gun." App. Vol. IV at 1085, 1087.

During his OSBI interview and in a subsequent affidavit, Deputy Orr also stated that he had seen Mr. Krueger try to pull Deputy Phillips into the car and reach for his gun. But Deputy Orr stated at his OSBI interview that Deputy Phillips "[went] to grab [Mr. Krueger]" *first* while Mr. Krueger was "still actively reaching around" with "papers in his lap, credit cards or something." App. Vol. V at 1135. Then, at Deputy Orr's deposition, he testified that he could no longer recall what happened when Deputy Phillips approached the car because everything had happened so fast, would not testify that Deputy Phillips opened the door first, and would not definitively confirm that he ever saw Mr. Krueger's hand on Deputy Phillips's gun. He also did not testify that Mr. Krueger ever grabbed either Deputy, only that Mr. Krueger was not compliant with their orders and that they took him to the ground.

Construing these conflicting accounts in the light most favorable to Mr. Krueger, after Deputy Phillips opened Mr. Krueger's car door, he grabbed Mr. Krueger first to pull him out of the vehicle, as Mr. Krueger continued to fumble with the pile of cards and papers. Mr. Krueger did not reach for Deputy Phillips's gun but did grab Deputy Phillips's arm and leg after the two Deputies made physical contact with him and began to pull him from the car, not realizing his seatbelt was still on.

Beyond these inconsistent accounts, the Deputies' credibility is also called into question by video evidence that undercuts or directly contradicts their testimony describing other parts of the encounter. For example, Deputy Orr testified that Mr. Krueger was acting bizarrely at the gas station by cleaning only one side of his windshield, but the gas station video shows Mr. Krueger cleaning the entire windshield. Deputy Orr further testified that Mr. Krueger was "holding . . . his hand up like he was talk[ing] on the phone," but this behavior is not visible in the video. App. Vol. IV at 1032. Further, both Deputy Phillips and Deputy Orr stated in sworn affidavits that Mr. Krueger called them "fuckers" and "motherfuckers" when they walked away from him at the end of the encounter. App. Vol. III at 711, 726. But in the video, Mr. Krueger is mumbling at this point in the encounter, while Deputy Phillips calls Mr. Krueger "fucker" and "motherfucker" just before he walks away. App. Vol. II at 395 (Phillips Body Camera Footage) at 5:04–5:10. Indeed, while Deputy Phillips specifically testified that he did not directly call Mr. Krueger a motherfucker during the encounter, and only uttered curse words out of exhaustion, that testimony is contradicted by his own body camera video, in which he exclaims, "Goddamn! You motherfucker!" while holding Mr. Krueger down. *Id.* at 3:30–3:33. Finally, the Deputies testified that they walked away after their encounter with Mr. Krueger and did not return until someone yelled he was not breathing. But the body camera footage shows that they both returned and looked down at Mr. Krueger while he was subjected to the prone restraint by City of Wagoner Police Officers.

Circumstantial evidence also supports the Estate's version of events that Mr. Krueger was simply trying to provide his driver's license and insurance information and was given no chance to comply before Deputy Phillips grabbed him and dragged him from the car. First, photographs from the scene show Mr. Krueger's driver's license on the driver's seat, two credit cards on the ground outside the door of Mr. Krueger's open vehicle, and Mr. Krueger's insurance card on the ground nearby, corroborating the account Mr. Krueger was simply gathering relevant information when he was suddenly pulled from the vehicle.



*A photograph of the scene shows Mr. Krueger's open car doors with his driver's license on the front seat and two credit cards on the ground next to the door. App. Vol. VI at 1492.*



*Mr. Krueger's car insurance information also on the ground near his car. App. Vol. VI at 1498.*



*A closer photograph of Mr. Krueger's driver's license on his front seat. App. Vol. VI at 1499.*

Second, the computer-aided dispatch ("CAD") logs from the incident show that Deputies Phillips and Orr reported they arrived on scene at 9:55:44 and 9:55:53 p.m., respectively. Just six seconds after Deputy Orr arrived, at 9:55:59, he reported to dispatch there was "one fighting." App. Vol. II at 399. That means only fifteen seconds passed from when Deputy Phillips arrived on scene, and just six seconds from when Deputy Orr arrived, to when the Deputies had removed Mr. Krueger from his car and begun to struggle on the ground. That brief timeline undercuts Deputy Orr's and Deputy Phillips's testimony that they gave multiple commands to Mr. Krueger that he ignored before they reached into the car and decided to extract

him. The timeline, however, supports the Estate's account—along with Deputy Orr's initial testimony to the OSBI—that Deputy Phillips decided to remove Mr. Krueger from the car before he had any chance to comply.

Considering the Deputies' conflicting accounts and the Estate's circumstantial evidence, a reasonable jury could find that Mr. Krueger was grabbed by Deputy Phillips as he tried to locate his driver's license and registration and was taken to the ground before he had a chance to comply with any commands. A reasonable jury could further find that to the extent Mr. Krueger grabbed the Deputies, the motion was involuntary, out of fear, or surprise as he was violently pulled from his car.

After the Deputies undid Mr. Krueger's seatbelt, they pulled him from his car by his hair. Deputies Orr and Phillips then threw Mr. Krueger to the ground and a struggle ensued. At some point during the struggle, before Deputy Phillips's body camera footage begins, Mr. Krueger suffered a severe blow to the head, opening a gash in his forehead that covered the highway with blood.[8] Additionally, Mr. Krueger's hair had been grabbed with enough force to leave a bloody wad of it behind.

---

[8] While Deputy Phillips and Deputy Orr disagree that they caused the head slam, they do not argue that this fact is blatantly contradicted by the record. Instead, they accept the finding and argue that even with the head injury, the use of force was reasonable. Moreover, as the County Defendants acknowledge in their reply brief, Deputy Phillips stated in his deposition that it was "a possibility" that he or Deputy Orr had struck Mr. Krueger's head on the pavement during the struggle. App. Vol. III at 781; *see* Cnty. Defs.' Reply Br. at 10.



*Scene photograph of the blood left behind on the highway. App. Vol. VI at 1494.*



*A wad of Mr. Krueger's hair. Id. at 1495.*



*A photograph taken at the hospital of the gash left in Mr. Krueger's head. App. Vol. VII at 1822.*

b.      *Struggle captured by body camera*

According to the Deputies, a ground struggle ensued as they attempted to get Mr. Krueger's hands behind his back to handcuff. The struggle lasted for at least a minute and a half before Deputy Phillips's body camera began to capture the encounter.

During the portion of the encounter captured by the body camera, Mr. Krueger was initially on the ground, kicking, as the Deputies attempted to restrain him and yelled repeatedly for him to turn over. Just a few seconds later, Mr. Krueger asked, "what do you want me to do?" and then repeatedly asked for help as the Deputies simultaneously commanded him to turn over while holding him down, preventing him from doing so. App. Vol. II at 395 (Phillips Body Camera Footage) at 0:15–30. The video shows that Mr. Krueger did not move or struggle for about twenty seconds. When Mr. Krueger began to struggle and kick again, the Deputies deployed their taser for approximately eight seconds and continued to command him to turn over.

After this deployment of the taser, Mr. Krueger kicked again, weakly, as the Deputies commanded him to give them his hands. For the next forty-five seconds, they held down Mr. Krueger and attempted to place handcuffs on him. They repeatedly yelled for him to turn over and he repeatedly responded that he was trying. During this interval, Deputy Orr had his body on Mr. Krueger, apparently preventing him from complying with the command to turn over, while Deputy Phillips held his taser at the ready against Mr. Krueger's thigh. Deputy Orr again commanded for Mr. Krueger to give his hands, and immediately after told Deputy Phillips to tase

29

him. Deputy Phillips deployed the taser again for at least five seconds. When the taser was deployed this time, Mr. Krueger had been held down for almost a minute by both Deputies and was no longer kicking.

Mr. Krueger reached for something on Deputy Phillips's belt. Deputy Phillips yelled for him to let go, and then said that Mr. Krueger tried to grab his taser. After briefly standing up and repositioning, the Deputies continued to hold Mr. Krueger down for about a minute and a half and tried to handcuff him. They did not deploy the taser again, but continuously held him down even as Mr. Krueger's cries for help grew increasingly faint and unintelligible. The Deputies finally managed to pull Mr. Krueger's arm behind his back and handcuff him with the help of two EMTs who responded to the scene, as Mr. Krueger continued to lie on the ground exhausted, barely moving.

As more officers responded to the scene, one called out, "God damn! There's a lot of blood. He's covered in blood." *Id.* at 4:49–5:00. After the newly arriving officers confirmed they had control of Mr. Krueger, Deputy Phillips walked away toward a patrol car.

Deputy Orr stated in his interview with investigators that during the course of the encounter, he used his taser on Mr. Krueger at least three times in drive-stun mode. Deputy Orr reported that Deputy Phillips also used a taser on Mr. Krueger two to three times in drive-stun mode. Deputy Orr also indicated he struck Mr. Krueger two to three times in the jaw. In his deposition, Deputy Orr further stated the taser was set to 50,000 volts and that he was using it for "pain compliance." App. Vol. IV

30

at 1043. In Deputy Phillips's deposition, he confirmed he used the taser "approximately[] three times" in drive-stun mode for "pain compliance." *Id*. at 1091–92. According to the Estate's excessive force expert, the taser records show one of the tasers was activated three times for ten total seconds, while the other was activated five times for twenty-five total seconds, in drive-stun mode.

The Deputies dispute that each taser activation made contact with Mr. Krueger's body. The video—which captures only part of the encounter—contains audio of the taser being deployed but is too shaky and dark to show definitively how many times the taser made contact. Viewing the facts in the light most favorable to Mr. Krueger, as we must at this stage, the Deputies used the taser on Mr. Krueger eight times, in drive-stun mode; punched him multiple times in the torso; and struck him in the jaw three times. Some of those taser applications and punches occurred before the body camera footage begins, creating a material factual dispute as to whether Mr. Krueger was subdued or fighting back during the unrecorded taser strikes and punches.

As noted above, while Deputies Orr and Phillips claimed they had no further contact with Mr. Krueger, body camera footage of the subsequent encounter with City of Wagoner Police shows Deputies Orr and Phillips returned to observe what was happening, and each Deputy looked down and observed as the other Defendants pinned Mr. Krueger to the ground and decided to chain his feet.

31

2.    **Encounter Between Mr. Krueger and Deputy Lott, Lieutenant Crockett,
and Officers Blair, Craig, McFarland, and Nevitt**

a.    *District court's factual findings*

During Deputy Orr's encounter with Mr. Krueger, he sent out radio calls

advising other law enforcement of the encounter, including a call reporting he had

"one [suspect] fighting," and another that he "need[ed] help." App. Vol. VIII at 2102.

The other Defendants heard and responded to Deputy Orr's call. Deputy Lott heard

the call at approximately 10:00 p.m. and advised dispatch he was en route. City of

Wagoner Police Officers Blair, Craig, McFarland, and Nevitt also received the

message that County deputies needed help and responded to the scene.

After being delayed by a passing train, Deputy Lott arrived just as Deputy Orr

sent out a radio call reporting that he had "one in custody." *Id.* at 2102. Deputy Lott

parked his patrol vehicle to block oncoming traffic, exited the vehicle, and saw

Mr. Krueger—handcuffed and face down on the pavement—with Deputies Orr and

Phillips along with the EMTs. Deputy Lott later testified that as he approached,

Mr. Krueger was still kicking, his eyes were open, and he appeared to be fully

conscious.

The Officers similarly testified that Mr. Krueger was still kicking and fighting

as they approached the scene. They took over for Deputies Orr and Phillips and

began to hold down the prone Mr. Krueger. Officer Craig placed his right knee on

Mr. Krueger's right shoulder, while "Officer McFarland placed his right shin and

knee on Mr. Krueger's waistline and his left knee over Mr. Krueger's left shoulder."

32

*Id*. at 2079. Although the parties dispute how much weight Officer McFarland placed on Mr. Krueger, the district court found the video supported the Estate's contention that Officer McFarland rested his full weight on both knees.[9] Officers Nevitt and Blair did not participate in restraining Mr. Krueger or taking him into custody, but testified they witnessed Mr. Krueger handcuffed and face down with other officers on top of him.

Lieutenant Crockett arrived on the scene after Deputies Orr and Phillips had walked away from Mr. Krueger. Lieutenant Crockett first checked in with the Deputies before approaching Mr. Krueger. After observing Mr. Krueger kick one of the officers, Lieutenant Crockett approached to help. She knelt on Mr. Krueger's left buttock and left upper thigh. Meanwhile, Officer Craig had retrieved leg shackles, and he and Lieutenant Crockett placed the shackles on Mr. Krueger while Lieutenant Crockett continued to kneel on his buttock and thigh. Lieutenant Crockett placed her weight on the prone Mr. Krueger for between forty-five seconds to one minute total, until the leg irons were secure.[10] As Officers McFarland and Craig continued to place

---

[9] The City Defendants argue in their opening brief that this fact is not supported by the record, *see* City Defs.' Br. at 29–30, but in their reply brief, they state that even if the finding were correct, any force used was not excessive, *see* City Defs.' Reply Br. at 12.

[10] Lieutenant Crockett argues that any finding that she put weight on Mr. Krueger's back as opposed to his buttock and thigh is blatantly contradicted by the record and the district court's own factual findings. We agree with Lieutenant Crockett that the district court's factual finding is that she put her weight on Mr. Krueger's left buttock and thigh, not his back. But as discussed *infra*, this still

weight on Mr. Krueger, Lieutenant Crockett went to her car, where she had no further contact with Mr. Krueger.

During this interval, Deputy Lott placed his foot on the top of the prone Mr. Krueger's right shoulder for approximately one minute. While Deputy Lott asserted that he did not place weight on Mr. Krueger's shoulder, the district court noted that fact could not be determined from the video, which shows Deputy Lott's foot on Mr. Krueger's shoulder.

As the restraint continued, the officers asked if they could "hobble" Mr. Krueger—connect the leg restraints to the handcuffs with a chain—because he continued to move and kick his legs.[11] Deputy Lott left and retrieved a hobble chain from his patrol car and handed it to the officers. The officers placed the chain, connecting Mr. Krueger's handcuffed wrists to his shackled feet by between twelve to fourteen inches of chain. Deputy Lott observed, but did not participate in, the

---

makes Lieutenant Crockett potentially liable for her participation in the prone restraint under our precedent.

[11] The City Defendants argue that the district court wrongly referred to this as a hog-tie, as opposed to a hobble-tie, at one point in its decision. A "hog-tie restraint . . . involve[s] the binding of the ankles to the wrists, behind the back, with 12 inches or less of separation." *Cruz v. City of Laramie*, 239 F.3d 1183, 1188 (10th Cir. 2001). As explained by the City Defendants, a hobble-tie is similar but involves a longer chain connecting the ankles to the wrists—here, somewhere between 14 and 18 inches. City Defs.' Br. at 35. The district court clearly referred to the restraint as a "hobble-tie," and later in its order, called it a "hog-tie-like" restraint. App. Vol. VIII at 2084. We detect no contradiction and accept the factual finding that Mr. Krueger was hobble-tied.

34

hobble chaining. He also observed the officers with their knees on Mr. Krueger's back.

Shortly after placement of the hobble chain, Officer Blair noticed that Mr. Krueger's breathing had changed and asked, "He's still breathing ain't he?" *Id*. at 2080. Officer McFarland realized that Mr. Krueger was shallow breathing and called for the EMTs on scene. Deputy Lott had moved to stand with Deputies Orr and Phillips when he heard Officer Blair ask if Mr. Krueger was still breathing. Until that point, Deputy Lott believed Mr. Krueger was still breathing and not experiencing a medical emergency.

After the EMTs loaded Mr. Krueger into the ambulance, Deputy Lott drove the ambulance to the Wagoner Community Hospital, where Mr. Krueger was pronounced dead. The state medical examiner reported the cause of death as "cardiac dysrhythmias due to probable acute psychosis in the setting of physical exertion and restraint." *Id*. at 2080–81. Mr. Krueger was six feet three inches tall, weighed 156 pounds, and was thirty-six years old when he died.[12]

---

[12] In its order denying summary judgment to the City Defendants, the district court stated—without any additional factfinding or analysis—that "Mr. Krueger certainly appears to have diminished capacity in the body cam videos." *Id*. at 2085. The district court relied on this fact to conclude that the City Defendants were liable for excessive force under *Cruz*, 239 F.3d 1183, which held that subjecting an individual to a prone restraint and hog-tie "when an individual's diminished capacity is apparent" constitutes excessive force. *Id*. at 1188. We defined "diminished capacity" as potentially "result[ing] from severe intoxication, the influence of controlled substances, a discernible mental condition, or any other condition, apparent to the officers at the time, which would make the application of a hog-tie

b.      *Cumbersome review*

The district court determined that Mr. Krueger was kicking, his eyes were open, and he was conscious when the second group of officers arrived, and also found that Mr. Krueger continued to kick and move his legs later in the restraint. However, it made no finding as to Mr. Krueger's consciousness, level of struggle, or how effectively he was subdued by the officers throughout the encounter. *See id.* at 2102; *see also id.* at 2084, 2112 (performing *Graham* excessive force analysis only as to the beginning of the encounter).

Whether a suspect was effectively subdued is a key material fact in the excessive force analysis. *See, e.g.*, *Weigel v. Broad*, 544 F.3d 1143, 1152 (10th

---

restraint likely to result in any significant risk to the individual's health or well-being." *Id.*

On appeal, the City Defendants argue that the district court made no factual findings that demonstrate they were made aware of Mr. Krueger's diminished capacity. *See* City Defs.' Br. at 34. We agree that based on the district court's factual findings, the later responding law enforcement officers were not aware of any diminished capacity as defined in *Cruz* (such as severe intoxication or a discernible mental condition). Moreover, as discussed *supra*, while Deputies Orr and Phillips believed based on their encounter with Mr. Krueger at the gas station that he may have been intoxicated, it is not apparent from the record they communicated any potential intoxication to the later responding officers.

However, that the City Defendants along with Deputy Lott and Lieutenant Crockett did not perceive Mr. Krueger to have diminished capacity does not change our excessive force analysis. While the district court relied in part on *Cruz* to conclude that the use of a prolonged prone restraint constituted excessive force, *see* App. Vol. VIII at 2085, as discussed *infra*, we hold the Defendants could be found liable under our later precedents establishing that the use of a prolonged prone restraint can constitute excessive force regardless of a suspect's diminished capacity.

36

Cir. 2008) (holding officers used excessive force during prone restraint because "there is evidence that [the decedent] was subjected to such pressure for a significant period *after it was clear that the pressure was unnecessary to restrain him*" (emphasis added)); *Lynch v. Bd. of Cnty. Comm'rs of Muskogee Cnty.*, 786 F. App'x 774, 782 (10th Cir. 2019) (unpublished) ("The key issue in evaluating [the officers'] use of force is whether they continued using force after [the decedent] was subdued."); *Teetz*, 142 F.4th at 723–24. Accordingly, we conduct a cumbersome review of the record to determine the level of Mr. Krueger's resistance throughout the encounter, which in turn, allows us to ascertain which material facts the district court likely relied on in concluding that the prone restraint constituted excessive force. *See Booker*, 745 F.3d at 410.

We are aided in our review by the body camera footage from another City of Wagoner police officer who responded to the scene, Travis Potts. For approximately two minutes, Mr. Krueger can be seen prone, handcuffed, and restrained by multiple officers while not visibly moving, struggling, or speaking. The footage then becomes unclear as Officer Potts moves, making it difficult to see Mr. Krueger, but the prone restraint continues for approximately another minute until an officer asks if Mr. Krueger is still breathing, and the EMTs are called. Each time Mr. Krueger comes into view, at least two officers are on his prone body, and he is not visibly moving, struggling, or speaking.

While Mr. Krueger weighed 156 pounds, Officer Craig weighed approximately 235 pounds, Officer McFarland weighed approximately 230 pounds, and Lieutenant

37

Crockett weighed about 200 pounds, for a combined weight of 665 pounds—over four times Mr. Krueger's body weight, without accounting for Deputy Lott's foot on Mr. Krueger's shoulder. The Estate submitted a medical expert report which found that Mr. Krueger's cause of death was positional asphyxia. Specifically, the Estate's expert opined that the weight placed on Mr. Krueger while he was restrained in a prone position led to his death, and that Mr. Krueger had been in a prone position for "at least three or four minutes." App. Vol. IV at 995. The medical expert also noted that Mr. Krueger had several broken ribs when he died which contributed to the asphyxia. *Id.* The expert attributed the broken ribs to the prone restraint. *Id.* And the medical expert opined that being placed in a prone restraint would have caused Mr. Krueger to panic and struggle in an attempt to breathe.

Finally, the law enforcement officers testified inconsistently about whether Mr. Krueger was speaking or making any noise during the prone restraint. Officer Craig testified that Mr. Krueger was not speaking, mumbling, or moaning while he interacted with him, and Lieutenant Crockett similarly testified Mr. Krueger did not speak at all when she held him down. In contrast, Deputy Lott asserted that Mr. Krueger was "kicking and resisting," saying things like "get the fuck off of me, motherfuckers." App. Vol. VII at 1841.[13]

---

[13] As discussed above, any statement to this effect by Mr. Krueger is not audible on the body camera footage; he cannot be heard speaking or even mumbling.

Viewing the disputed facts in the light most favorable to the Estate, Mr. Krueger was subject to a prone restraint while he was handcuffed, and his legs were eventually restrained. Officers McFarland and Craig, along with Deputy Lott and Lieutenant Crockett, continually applied weight to Mr. Krueger for up to four minutes while he did not meaningfully resist or speak.

### B.   District Court Decision

On February 16, 2021, the Estate filed a § 1983 complaint alleging, among other things, excessive force. After several rounds of pleading during which the Estate added additional defendants, the Estate filed the operative Fourth Amended Complaint on July 11, 2022.[14]

In the operative complaint, the Estate broadly alleged that Defendants Phillips, Orr, Lott, Crockett, Craig, McFarland, Nevitt, and Blair, among others, "beat[], tased, and/or suffocated to death" Mr. Krueger. App. Vol. I at 270. The Estate specifically alleged that two EMT defendants (who are not party to this interlocutory appeal) "fail[ed] to intervene and stop" the deputies from beating and suffocating Mr. Krueger but contained no parallel allegations for any of the officers or deputies. *Id.* at 271.

In the factual allegation section of the complaint, the Estate alleged in more detail that Deputies Phillips and Orr, along with Officers Craig and McFarland,

---

[14] The Estate brought other state and federal claims against Defendants, along with claims against other parties including the EMTs present on scene, but those claims and parties are not at issue in this interlocutory appeal.

39

"assaulted, arrested and handcuffed Mr. Krueger." *Id.* at 276. In a paragraph concerning the EMT defendants only, the Estate alleged that they "acted as law enforcement officers by handcuffing and subduing Mr. Krueger," and that "[a]ll state actors have a duty to intervene and stop the use of excessive force." *Id.* at 276–77. This paragraph quoted case law on the failure to intervene, stating that "a law enforcement official who fails to intervene to prevent another law enforcement official's use of excessive force may be liable under § 1983," *id.* at 277 (quoting *Maresca v. Bernalillo Cnty.*, 804 F.3d 1301, 1314 (10th Cir. 2015)), and that "an officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force, can be held liable for his nonfeasance," *id.* (quoting *Fundiller v. City of Cooper City*, 777 F.2d 1436, 1441–42 (11th Cir. 1985)).

The Estate further alleged that "Mr. Krueger was found to be not breathing and with fixed and dilated pupils," and "[a]t no time did Deputies Orr or Phillips or Officers Craig or McFarland (*and other named defendants* above, though the exact ones are unknown at this time) stop their use of excessive force on Mr. Krueger after he asked for help and said he couldn't breathe, nor did they or EMTs Patterson and Smith (*and other named defendants above*, though the exact ones are unknown at this time) render medical aid or care to or assist Mr. Krueger with his cries for help." *Id.*

40

(emphases added). The complaint stated a claim for excessive force against all defendants but did not separately state a failure to intervene claim. *Id.* at 280–81.[15]

Following discovery, on May 15, 2023, the Defendants each moved for summary judgment, asserting qualified immunity as to the excessive force claims. Some of the Defendants also addressed a failure to intervene theory at summary judgment. On March 26, 2024, the district court resolved the motions for summary judgment in two written orders. Those orders denied summary judgment as to the excessive force claims, specifically concluding that the Estate had come forward with enough materially disputed evidence to allow a reasonable jury to conclude Officers Craig and McFarland along with Lieutenant Crockett and Deputies Lott, Phillips, and Orr were liable for excessive force and that all eight Defendants were liable for failing to intervene.[16]

---

[15] The district court noted, in an order denying in part a motion to dismiss an earlier iteration of the complaint, that it was construing the complaint to encompass a failure to intervene theory. *See Krueger v. Bd. of Cnty. Comm'rs of Wagoner Cnty.*, No. CIV-21-044-RAW, Dkt. 153 (Order Denying Motion to Dismiss) at 5 n.4.

[16] The district court held that an individualized analysis of each officers' behavior was necessary, citing *Pahls v. Thomas*, 718 F.3d 1210 (10th Cir. 2013), a First Amendment case. But in the Fourth Amendment excessive force context, we have recognized that—at summary judgment—officer conduct may be aggregated:

> Although we frequently conduct separate qualified immunity analyses for different defendants, we have not always done so at the summary judgment stage of excessive force cases. Where appropriate, we have aggregated officer conduct. In *Weigel v. Broad,* 544 F.3d 1143 (10th Cir. 2008), for instance, two officers handcuffed an arrestee and bound his legs. For three minutes, one of the officers applied pressure to the man's upper torso as the man lay on his stomach, while the other officer went to warm his hands in

As to the excessive force claims against Deputies Phillips and Orr arising out of the removal of Mr. Krueger from his car, the district court concluded that even though "each of the *Graham*[ *v. Connor*, 490 U.S. 386 (1989)] factors—(1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether he was actively resisting arrest— weighed in the Deputies' favor" once Mr. Krueger grabbed the Deputies, it was not "objectively reasonable . . . for [the Deputies] to slam his head to the ground" and there were "issues of material fact" as to whether the "force used thereafter was objectively reasonable." App. Vol. VIII at 2111. The district court further concluded that even in the absence of specific case law concerning head slamming, this was the "rare obvious case, where the unlawfulness of the officer's conduct is sufficiently clear." *Id.* at 2113 (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 64 (2018)).

As to the excessive force claims against Lieutenant Crockett, Deputy Lott, and Officers McFarland and Craig arising out of the prone restraint, the district court concluded again that "the *Graham* factors weigh in their favor," but "under the totality of the circumstances," whether the officers' use of force was objectively

---

the police cruiser. The man died of asphyxiation, and his estate sued both officers under § 1983. Even though only one officer placed pressure on the victim's back, we did not perform separate analyses for the two officers and denied qualified immunity for both of them.

*Booker*, 745 F.3d at 421.

We agree with the district court that the record supports a finding of individual liability as to each Defendant. But we reaffirm that in appropriate excessive force cases, officer conduct may be aggregated.

reasonable given that Mr. Krueger was face down and handcuffed was a factual issue that survived summary judgment. *Id.* at 2112. The district court further concluded that it is "clearly established that putting substantial or significant pressure on a suspect's back while that suspect is in a face-down prone position after being subdued and/or incapacitated constitutes excessive force." *Id.* at 2114 (quoting *Booker*, 745 F.3d at 424). The district court accordingly denied summary judgment as to the claims against Lieutenant Crockett, Deputy Lott, and Officers McFarland and Craig. However, the court granted the motion for summary judgment as to the excessive force claim against Officers Nevitt and Blair, finding they had not participated in the prone restraint.

As to the failure to intervene claim, the district court determined each of the eight Defendants was liable. And with respect to the claims against the County Defendants (Deputies Phillips, Orr, Lott, and Lieutenant Crockett), the district court concluded that because the Estate had "presented sufficient disputed evidence to meet their burden to show that Deputies Phillips, Orr, Lott and Lieutenant Crockett used excessive force," and because each Defendant was also there "to observe other deputies and officers," there was sufficient evidence that "each officer observed it happening, and each officer had a realistic opportunity to intervene, but failed to do so." *Id.* at 2114–15. Similarly, because the court held there was sufficient evidence to show Officers McFarland and Craig had used excessive force, it concluded there was sufficient evidence to show each officer had failed to prevent the other's use of excessive force. Although the court held that Officers Nevitt and Blair were not liable

43

for excessive force, it concluded that because the Estate had presented "undisputed" evidence that "Officers Nevitt and Blair observed Mr. Krueger pinned down under the officers' knees," they could be found liable for failing to intervene. *Id.* at 2087. The court further held the failure to intervene claim was clearly established by *Weigel,* 544 F.3d at 1153 n.4.

Following Lieutenant Crockett's unsuccessful motion to reconsider, Defendants timely appealed.

## PART III: LEGAL BACKGROUND

### A.    Standard of Review

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby*, 477 U.S. 242, 247–48 (1986). "Material" facts are determined with reference to the substantive law; "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248. At this stage, the court's function "is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial," *i.e.*, if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249.

### B.    *Qualified Immunity*

The substantive law here is § 1983 and qualified immunity. "In resolving questions of qualified immunity at summary judgment, courts engage in a two-pronged inquiry," first asking whether the facts "[t]aken in the light most favorable to the party asserting the injury, . . . show the officer's conduct violated a federal right." *Tolan v. Cotton*, 572 U.S. 650, 655–56 (2014) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). The second prong considers whether the right in question was "clearly established." *Id.* at 656. Qualified immunity cases in particular "illustrate the importance of drawing inferences in favor of the nonmovant, even when, as here, a court decides only the clearly-established prong of the standard." *Id.* at 657. This is because the "clearly established" prong depends on "the specific context of the case." *Id.* (quoting *Saucier*, 533 U.S. at 201). Therefore, "courts must take care not to define a case's 'context' in a manner that imports genuinely disputed factual propositions." *Id.*

### 1.    **Constitutional Violation**

We analyze excessive force claims "under the Fourth Amendment and its 'reasonableness' standard." *Graham*, 490 U.S. at 395. Our inquiry "is an objective one," and asks "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397. "Reasonableness is evaluated under a totality of the circumstances approach which requires that we consider the following factors: '[1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the

45

safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Weigel*, 544 F.3d at 1151–52 (quoting *Graham*, 490 U.S. at 396). We have recognized that the second *Graham* factor "is undoubtedly the 'most important' . . . factor in determining the objective reasonableness of an officer's use of force." *Pauly*, 874 F.3d at 1216 (quoting *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010)). "Additionally, 'the reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Weigel*, 544 F.3d at 1152 (quoting *Graham*, 490 U.S. at 396).

As the Supreme Court recently emphasized, a court "must consider all the relevant circumstances, including facts and events leading up to the climactic moment," rather than just the "moment-of-threat," in assessing the reasonableness of force. *Barnes v. Felix*, 145 S. Ct. 1353, 1356 (2025). "There is no 'easy-to-apply legal test' or 'on/off switch' in this context." *Id.* at 1358 (quoting *Scott*, 550 U.S. at 382–83). "Rather, the Fourth Amendment requires . . . that a court 'slosh [its] way through' a 'factbound morass.'" *Id.* (alteration in original) (quoting *Scott*, 550 U.S. at 383).

Under this totality of the circumstances analysis, we ask whether the force used is "proportional to [the suspect's] crime." *Perea*, 817 F.3d at 1203. Additionally, where—as here—officers use multiple forms of force, we generally consider whether the combined force was reasonable. *See Vette*, 989 F.3d at 1171 (considering whether "striking [plaintiff] in the face and releasing a police dog to attack him" was "objectively reasonable"); *McCoy v. Meyers*, 887 F.3d 1034, 1051

46

(10th Cir. 2018) (considering whether "[striking plaintiff] more than 10 times and plac[ing] him in a carotid restraint" was reasonable); *Davis v. Clifford*, 825 F.3d 1131, 1134 (10th Cir. 2016) (considering whether "grabb[ing] [plaintiff] by her hair and arms, pull[ing] her through the shattered [car] window, pinn[ing] her face-down on the broken glass outside the car, and handcuff[ing] her" was reasonable). At the same time, in situations in which a suspect is restrained and subject to force, we generally separate our analysis into pre- and post-restraint force. *See, e.g.*, *Luethje v. Kyle*, 131 F.4th 1179, 1198 (10th Cir. 2025).

## 2.     Clearly Established

"To be clearly established, ordinarily there must be prior Supreme Court or Tenth Circuit precedent, or the weight of authority from other circuits, that would have put an objective officer in [Defendants'] position on notice that [they were] violating [the decedent's] Fourth Amendment rights." *Vette*, 989 F.3d at 1171 (quotation marks omitted). The Supreme Court has repeatedly cautioned that we may "not . . . define clearly established law at a high level of generality." *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (quoting *City & Cnty. of San Francisco v. Sheehan*, 575 U.S. 600, 613 (2015)). Moreover, "specificity is especially important in the Fourth Amendment context." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam). "Use of excessive force is an area of the law 'in which the result depends very much on the facts of each case,' and thus police officers are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue." *Kisela*, 584 U.S. at 104 (quoting *Mullenix*, 577 U.S. at 13). "Precedent involving

47

similar facts can help move a case beyond the otherwise 'hazy border between excessive and acceptable force.'" *Id.* at 105 (quoting *Mullenix*, 577 U.S. at 18).

"Nonetheless, even in the Fourth Amendment context, there need not be a prior 'case directly on point,' so long as there is existing precedent that places the unconstitutionality of the alleged conduct 'beyond debate.'" *McCowan v. Morales*, 945 F.3d 1276, 1285 (10th Cir. 2019) (quoting *Wesby*, 583 U.S. at 64). Thus, "even in excessive force cases, this court's analysis is not a scavenger hunt for prior cases with precisely the same facts, and a prior case need not be exactly parallel to the conduct here for the officials to have been on notice of clearly established law." *Vette*, 989 F.3d at 1171–72 (internal quotation marks omitted). "Rather, the salient question is whether the state of the law at the time of an incident provided fair warning to the defendants that their alleged conduct was unconstitutional." *Id.* at 1172 (quotation marks omitted).

We now apply the facts a reasonable jury could find based on our de novo review of the record to the law of qualified immunity.

### PART IV: ANALYSIS

The Defendants raise three primary arguments across their separate briefs: first, that Deputy Orr's and Deputy Phillips's use of force was not excessive; second, that Deputy Lott, Lieutenant Crockett, Officer Craig, and Officer McFarland did not use excessive force when they subjected Mr. Krueger to a prone restraint; and third, that the operative complaint did not properly plead a failure to intervene claim, or in

48

the alternative, that the facts found at summary judgment do not support a failure to intervene claim as to any Defendant.

For the reasons explained below, we conclude that the district court correctly denied summary judgment as to the excessive force and failure to intervene claims. Based on the evidence produced at summary judgment viewed in the light most favorable to the Estate, the Defendants are not entitled to qualified immunity. In explaining our conclusion, we first discuss whether Deputies Orr and Phillips used excessive force when they pulled Mr. Krueger from his car by the hair, slammed his head into the asphalt, and used their tasers in drive-stun mode eight times. Second, we consider whether those actions are clearly established as excessive force under our precedent. Next, we consider whether a reasonable jury could find that the Defendants who participated in the subsequent prone restraint or failed to intervene violated Mr. Krueger's constitutional rights. And upon concluding that it could, we turn to whether the Defendants were on notice that their conduct violated Mr. Krueger's constitutional rights based on clearly established law. Finally, we consider whether a reasonable jury could find the Defendants failed to intervene in the use of excessive force, and whether the failure to intervene was clearly established as a constitutional violation under these facts.

### A.    *Excessive Force – Deputy Orr and Deputy Phillips*

### 1.    **Constitutional Violation**

As discussed above, a reasonable jury could find that Deputies Orr and Phillips removed Mr. Krueger from his vehicle by force—pulling him out of his car by his

hair—and slammed him onto the asphalt, hitting his head against the pavement in the process. The jury could also find that before Deputies Orr and Phillips dragged Mr. Krueger from his car, they failed to give Mr. Krueger a chance to comply, the Deputies' commands were inconsistent, and they immediately placed Mr. Krueger at gunpoint despite suspecting him of only misdemeanor traffic violations. Once on the ground, Mr. Krueger struggled with the Deputies and kicked at them, and they began to deploy their tasers in drive-stun mode. During the later part of the encounter captured by video, it appears Mr. Krueger is effectively subdued; he is tased after he has been motionless for nearly a minute, he is not struggling, and his hands are under his body.

Separating the encounter into the initial use of force—pulling Mr. Krueger from his car and slamming his head onto the ground—and the later use of force during the struggle on the ground, we consider each *Graham* factor in turn and then analyze the use of force under the totality of the circumstances. Again, we do so considering the facts a jury could find, interpreting the evidence in the manner most favorable to the Estate.

a.    *Removal from car and slam into pavement*

All three *Graham* factors weigh in Mr. Krueger's favor as to the initial use of force. As to the first factor—severity of the crime at issue—Mr. Krueger had been pulled over for only minor traffic violations: speeding and failing to stay in his lane of travel. Because these are misdemeanor offenses, this first factor weighs in the Estate's favor. *See Davis*, 825 F.3d at 1135 ("The severity of [the plaintiff's] crime

50

weighs against the use of anything more than minimal force because the charge underlying her arrest . . . is a misdemeanor."); *Casey v. City of Federal Heights*, 509 F.3d 1278, 1282 (10th Cir. 2007) (same).

The Deputies argue that because Mr. Krueger grabbed Deputy Phillips, he was reasonably suspected of a battery and therefore was a felony suspect. But as discussed *supra* Section II.A.1, viewing the facts in the light most favorable to Mr. Krueger, Deputy Phillips grabbed him first and began to remove him from the car, and only then did Mr. Krueger grab Deputy Phillips. The jury could find that a reasonable officer would not have suspected a battery where seconds after arriving on scene the officer began removing a suspected misdemeanant from a vehicle at gunpoint while the seatbelt was still fastened, and the surprised suspect grabbed the officer.

As to the second *Graham* factor, whether Mr. Krueger posed an immediate safety threat to the officers or others, this factor also weighs in Mr. Krueger's favor. This factor weighs against law enforcement when "[t]here is no evidence that [a plaintiff] had access to a weapon or that [he] threatened harm to [himself] or others." *Davis*, 825 F.3d at 1135. Even where a suspect uses "minimal physical force against" an officer, where an officer is not "place[d] . . . in immediate danger," "slamm[ing] [a suspect] violently to the ground" is not reasonable. *Surat v. Klamser*, 52 F.4th 1261, 1275 (10th Cir. 2022). Here, it is undisputed that Mr. Krueger was not armed, and that the Deputies did not reasonably suspect him of having a weapon when they made the decision to remove him from his car. As discussed, the facts a reasonable

51

jury could find support that Deputy Phillips made the decision just seconds after arriving on scene to open Mr. Krueger's door and remove him from his vehicle by force while Mr. Krueger shuffled through his papers in an attempt to furnish his identification. There is no evidence he posed an immediate threat to the Deputies' safety as they approached the car and decided to remove him.

As to the third *Graham* factor—whether Mr. Krueger actively resisted arrest or attempted to evade arrest—this factor weighs slightly in his favor. When Deputies Phillips and Orr grabbed Mr. Krueger by the hair, removed him from his car, and slammed him into the ground, just six seconds had passed since both Deputies had arrived on scene. Even if Mr. Krueger had been given consistent commands, the jury could find he was not given time to comply before the Deputies forced him from his car, making the sudden use of force unreasonable. *See Casey*, 509 F.3d at 1282 (holding that grabbing and tackling a misdemeanant "without ever telling him that he was under arrest" is excessive force); *Roosevelt-Hennix v. Prickett*, 717 F.3d 751, 758–59 (10th Cir. 2013) (recognizing that when a suspect is unable to comply with law enforcement commands a lack of compliance is not resistance).

Moreover, even if Mr. Krueger heard but did not immediately comply with the inconsistent commands before the Deputies quickly removed him from his car, we have recognized that a low level of resistance, such as "attempting to pry [an officer's] fingers off" or "pawing at" an officer "does not justify a severe use of force in response" under this factor. *Surat*, 52 F.4th at 1275. Indeed, even where a suspect "refused to exit the vehicle when ordered," if the suspect has no means to flee or

52

there is no evidence they attempted to flee, this factor still weighs slightly against law enforcement. *Davis*, 825 F.3d at 1136. Here, the Deputies both testified Mr. Krueger had stopped his vehicle and was going through a pile of papers, possibly looking for his driver's license and insurance information, as they approached. Viewing the facts in the light most favorable to the Estate, Mr. Krueger did not attempt to flee or struggle before he was grabbed by Deputy Phillips, and this factor therefore weighs against the Deputies.

Finally, looking to the totality of the circumstances, Deputies Phillips and Orr had pulled over Mr. Krueger for minor traffic violations when they decided—just *six seconds* after both arriving on scene—to violently remove him from his car by the hair. Next, the Deputies threw Mr. Krueger to the ground with enough force that he sustained a serious head gash and lost a wad of his hair. While "an officer can effect an arrest for even a minor infraction, [a] minor offense—at most—support[s] the use of minimal force." *Perea*, 817 F.3d at 1203. Conversely, "the use of disproportionate force to arrest an individual who is not suspected of committing a serious crime and who poses no threat to others constitutes excessive force." *Id.* at 1204. Here, we readily conclude that a reasonable jury could find that the force used against Mr. Krueger at the beginning of the encounter—grabbing him by the hair, pulling him from his vehicle, and slamming his head into the asphalt—was disproportionate, and therefore, excessive.

b.      *Deployment of taser and punching*

After the Deputies slammed Mr. Krueger to the ground, he began to struggle and kick the Deputies. In response, they deployed their tasers against Mr. Krueger in drive-stun mode up to eight times. Additionally, the Deputies hit Mr. Krueger, including in the jaw. Viewing the facts in the light most favorable to Mr. Krueger, the force deployed was constitutionally excessive after the point the Deputies gained physical control over him.

As to the first *Graham* factor—severity of the crime at issue—while Mr. Krueger was initially pulled over for minor traffic violations, because he fought back and kicked the Deputies, they reasonably suspected Mr. Krueger of assault and battery against a deputy sheriff, in violation of 21 Okla. Stat. tit. 21, § 649(B), a felony. "[O]ur binding precedent indicates the first *Graham* factor weighs against the plaintiff when the crime at issue is a felony." *Vette*, 989 F.3d at 1170. Accordingly, this first factor weighs against Mr. Krueger. But as we have recognized, even when this factor weighs against a plaintiff, where the "remaining factors weigh []strongly against" a defendant, he "cannot prevail under the totality of the circumstances." *Id.*

The second and third *Graham* factors—whether the suspect poses an immediate threat to the safety of officers or others, and whether the suspect is actively resisting arrest—weighed in the Deputies' favor at the beginning of the encounter. Mr. Krueger was actively struggling and resisting arrest on a highway, posing an immediate threat to the officers, to Mr. Krueger himself, and to passing traffic. But as the encounter wore on—as captured by Deputy Phillips's body

54

camera—Mr. Krueger ceased to fight back, lay exhausted on the ground, and begged for help. Nonetheless, Deputies Phillips and Orr physically held Mr. Krueger down and tased him at least one additional time in drive-stun mode. This means the jury could find that Mr. Krueger was effectively subdued—held down by the Deputies, physically exhausted, and no longer fighting back—when the Deputies used force. At this point, the second and third *Graham* factors weighed in favor of Mr. Krueger, because he was subdued by the two Deputies and was no longer actively resisting.

Indeed, in response to the Deputies' commands to show his hands while they held Mr. Krueger down, pinning his hands under his body, Mr. Krueger asked repeatedly, "What do you want me to do?" App. Vol. II at 395 (Phillips Body Camera Footage) at 0:15–30. This suggests Mr. Krueger sought to comply with the Deputies' orders but was physically prevented from complying by the Deputies' holds. We have recognized that when a suspect is unable to comply with police commands, his lack of compliance is not resistance that could make force reasonable under the *Graham* factors. *See Roosevelt-Hennix*, 717 F.3d at 758–59 (holding suspect who was unable to move legs in compliance with officer orders was not resisting under *Graham*). Therefore, a reasonable jury could find that once Mr. Krueger was physically subdued, even though he was not complying with the commands to produce his hands, he was no longer resisting for purposes of *Graham* because he was physically unable to move his hands out from under his torso while the Deputies put their weight on top of him.

To be sure, before Mr. Krueger was effectively subdued, using a taser to effectuate the arrest was not unreasonable under our case law. *See, e.g.*, *Hinton v. City of Elwood*, 997 F.2d 774, 777 (10th Cir. 1993) (holding it was not excessive for officers to use a stun gun on a suspect after wrestling him to the ground when the suspect was actively resisting arrest by kicking and biting the officers). But whether additional taser strikes were reasonable turns on whether they occurred before or after Mr. Krueger was effectively subdued and whether the officers had time to become aware of that submission. Based on the conflicting evidence presented by Defendants and the video, a reasonable jury could find that Mr. Krueger was subdued during the later strikes and enough time had passed for the officers to know it.

Under those facts, the continued use of the taser once Mr. Krueger was effectively subdued was unreasonable and therefore excessive.[17]

2.    **Clearly Established**

a.    *Removal from car and slam into pavement*

It was clearly established by July 2019 that the Deputies used excessive force when they pulled Mr. Krueger out of his car by his hair and slammed him into the asphalt while he was suspected only of misdemeanor offenses. [18]

---

[17] Similarly, a finding that any continued punching or strikes to Mr. Krueger's jaw occurred after he was subdued would be excessive, because the *Graham* factors weighed against the Deputies at that point in the encounter.

[18] The district court concluded that even without "specific case law where an officer or officers slammed a person's head into the ground," this is the "rare 'obvious case,' where the unlawfulness of the officer's conduct is sufficiently clear

First, the facts of *Davis v. Clifford*, 825 F.3d 1131 (10th Cir. 2016), are

sufficiently on point to put the Deputies on notice the force was excessive. In *Davis*,

officers initiated a traffic stop because a run of the plaintiff's license plate showed a

warrant for driving on a license suspended for failing to provide proof of insurance.

*Id.* at 1133–34. After the plaintiff pulled into a parking lot, multiple officers

surrounded her with their police vehicles. *Id.* at 1134. Two officers approached her

car and began to hit it with batons, causing the plaintiff, in fear, to lock her doors and

roll up the window. *Id.* The two officers told the plaintiff to step out of the car.

Through a crack in the window, the plaintiff asked why she had been pulled over and

offered to show her license, insurance, and registration. *Id.* One of the officers said,

"you know why" and commanded her again to exit the vehicle. *Id.* She said she

would get out if the officers promised not to hurt her. *Id.* Instead, one of the officers

"shattered the driver's side window with his baton," and then two officers together

"grabbed [the plaintiff] by her hair and arms, pulled her through the shattered

window, pinned her face-down on the broken glass outside the car, and handcuffed

her." *Id.*

---

even though existing precedent does not address similar circumstances." App. Vol.
VIII at 2113 (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 64 (2018)). While
we agree the degree of force a jury could find was egregious, because there is
specific case law putting the Deputies on notice that pulling Mr. Krueger from his car
by the hair and slamming him to the ground can constitute excessive force, we do not
rely on the "rare 'obvious case'" exception.

The plaintiff sued the officers, alleging, *inter alia*, they used excessive force in arresting her. *Id.* We held the facts adduced at summary judgment, viewed in the light most favorable to the plaintiff, established a clearly established use of excessive force. *Id.* at 1135–37. We explained that all three *Graham* factors weighed in the plaintiff's favor. *Id.* at 1135–36. Specifically, the first factor—the severity of the plaintiff's crime—weighed "against the use of anything more than minimal force because the charge underlying her arrest . . . [was] a misdemeanor." *Id.* at 1135. The second factor—immediate threat to officer safety—also weighed in the plaintiff's favor, because there was "no evidence that [the plaintiff] had access to a weapon or that she threatened harm to herself or others," but rather that she "merely sought reassurance that she would not be hurt." *Id.* The third factor—whether the plaintiff actively resisted arrest or attempted to evade arrest—slightly weighed in her favor. *Id.* at 1136. Even though she "rolled up her window, left her keys in the ignition, and refused to exit the vehicle when ordered," she had no means to drive away based on how the other officers had parked and there was no evidence she attempted to flee. *Id.* That she "did not immediately obey the officers' orders" was not enough for this factor to weigh against her considering the totality of the circumstances. *Id.*

Here too, Mr. Krueger was pulled over for a minor traffic offense. When he did not immediately cooperate with the Deputies, a reasonable jury could find they reacted with disproportionate force. Both the plaintiff in *Davis* and Mr. Krueger were pulled from their vehicles by their hair and thrown to the ground. In fact, the force used here was even more egregious, because Mr. Krueger was pulled by his hair with

enough force to dislodge a chunk of it—and at some point, was slammed into the pavement with enough force to open a gash in his head that bled extensively.

True enough, *Davis* and the instant case are not beat-for-beat identical: the plaintiff in *Davis* pulled over into a parking lot rather than stopping in the middle of a highway. Her car had a handicapped sticker, speaking to her potential physical frailty, whereas the Deputies believed Mr. Krueger was intoxicated based on his behavior at the gas station. But our case law does not require "a scavenger hunt for cases with precisely the same facts" to clearly establish a constitutional violation. *Perea*, 817 F.3d at 1204 (quotation marks omitted). Here, the similarities—pulling over a nonviolent misdemeanant, the misdemeanant's failure to immediately comply with officer instructions, the quick decision to pull the misdemeanant out of the car and slam the misdemeanant to the ground, the lack of evidence of a weapon or danger to the officers—cannot be ignored and are sufficient to clearly establish the constitutional violation. *See id.* ("[T]he use of disproportionate force to arrest an individual who is not suspected of committing a serious crime and who poses no threat to others constitutes excessive force.").[19]

---

[19] The Deputies' case law is not to the contrary, because they point to cases in which a suspect mounted physical resistance to an arrest and officers used proportionate force in response—in all cases, force less egregious than that used here. *See Helvie v. Jenkins*, 66 F.4th 1227, 1241–42 (10th Cir. 2023) (holding lone officer did not use excessive force when pulling noncooperative motorist suspected of using marijuana from car, dragging suspect to back of car, and dropping a knee into the suspect's chest during handcuffing when arrest took place late at night, there were other passengers in the car and a firearm visible in the side door); *Mecham v. Frazier*, 500 F.3d 1200, 1204–05 (10th Cir. 2007) (holding officer did not use excessive force

b.      *Tasering and punching*

It is clearly established under our case law that continuing to strike felony suspects with tasers or beat them after the point it is obvious they are subdued and no longer an immediate threat to officers or others constitutes excessive force.

"[C]ontinued use of force after an individual has been subdued is a violation of the Fourth Amendment," including using tasers set to stun mode. *Id*. at 1205. In *Perea*, we held officers used excessive force when they pushed a misdemeanor suspect off his bicycle, tasered him once in "probe" mode (used to cause immobility), and then "tasered [the decedent] nine additional times" in "stun" mode (used to cause pain). *Id.* at 1201. We concluded that because the decedent posed only a minimal threat to the officers' safety, using the taser ten times was not "reasonable and proportionate." *Id.* at 1203. Rather, "a reasonable jury could find that [the officers]

---

when he pepper sprayed and removed motorist from car, and later put her on the ground, after she refused to exit her vehicle for over fifteen minutes); *Edwards v. City of Muskogee*, 841 F. App'x 79, 83–85 (10th Cir. 2021) (unpublished) (felony suspect driving under influence of PCP resisted arrest, making "considerable" force of a takedown resulting in a broken nose reasonable); *Youbyoung Park v. Gaitan*, 680 F. App'x 724, 739–40 (10th Cir. 2017) (unpublished) (suspect "fought back forcefully" making a knee strike and taking suspect to the ground proportionate); *Simpson v. Kansas*, 593 F. App'x 790, 792–93, 797 (10th Cir. 2014) (unpublished) (trooper did not use excessive force against motorist who ripped up traffic citation and refused multiple commands to exit vehicle when he "pulled her from the car, placed one hand on the back of her neck . . . walked her to the back of the car, and firmly guided her to the ground"). But here, in sharp contrast, a reasonable jury could find that Mr. Krueger did not physically resist arrest, but instead sought to locate his driver's license and insurance as the Deputies—within seconds of arriving on scene—pulled him from his car, slammed him to the ground, and cracked his head open. These facts stand in sharp contrast to other cases in which we have found the force necessary to effectuate an arrest reasonable.

continued to use the taser . . . even after the point where it could be considered

necessary or even debatably reasonable." *Id.* As we explained:

> Although use of some force against a resisting arrestee may be justified, continued and increased use of force against a subdued detainee is not. . . . [Here], the situation was not static over the course of the ten taserings . . . at some point . . . [the decedent] fell and the officers pushed him to the ground with his arms under his body. One officer was on the 'upper part of his body' while the second officer was on his legs. Even if [the decedent] initially posed a threat to the officers that justified tasering him, the justification disappeared when [the decedent] was under the officers' control.

*Id.* at 1203–04 (internal quotation marks omitted).

Here, as in *Perea*, the jury could find the Deputies used continued force

against a subdued suspect in the form of tasers set to stun mode. At the point when

Mr. Krueger was "under the officers' control," "the justification [to use force]

disappeared." *Id.* at 1204. It was clearly established beyond any reasonable debate by

*Perea* that it "is not reasonable for an officer to repeatedly use a taser against a

subdued arrestee . . . and who poses no threat to the officers or others." *Id.* Similarly,

in *Booker*, we held an officer used excessive force when he tased a suspect "for three

seconds longer than recommended when [the suspect] *was already handcuffed on the

ground and subdued by multiple deputies*." 745 F.3d at 424.

True enough, in *Perea*, the decedent was suspected only of a misdemeanor,

while Mr. Krueger was reasonably suspected of the felony of assault and battery

against a deputy by the time he was tasered. But we have held repeatedly that

continuing to use force against a felony suspect after that suspect is subdued and no

longer poses a threat to officers constitutes excessive force. *See, e.g.*, *Vette*, 989 F.3d

61

at 1170, 1172 (holding that striking felony suspect in face with dog chain and releasing police dog to attack him was unconstitutional where suspect was "already apprehended"); *McCoy*, 887 F.3d at 1049–51 (striking armed suspect ten times and placing him in carotid restraint where suspect was already handcuffed and zip-tied was excessive force); *Fancher v. Barrientos*, 723 F.3d 1191, 1196–97, 1201 (10th Cir. 2013) (holding a deputy used excessive force against suspect who physically attacked deputy and sought to take his gun when deputy shot suspect after suspect was injured and had no way to flee).

Because the Deputies were on notice that the precise use of force was excessive—continued deployments of a taser in stun mode against a subdued suspect—and were also on notice that any continued use of force against a felony suspect, including strikes and punches, is excessive where that suspect is restrained, they had ample notice that continuing to use the taser against Mr. Krueger after the point they were aware he was subdued was unconstitutional.

### 3.    Conclusion

A reasonable jury could find that Deputy Orr and Deputy Phillips used excessive force against Mr. Krueger when they pulled him out of his car by his hair, slammed his head on the ground, and continued to punch and tase him in stun mode after the point they became aware he was subdued. Because this force was clearly established as excessive by our case law, the district court did not err in denying qualified immunity to the Deputies.

### B.    *Excessive Force – Deputy Lott, Lieutenant Crockett, Officer Craig, and Officer McFarland*

The district court held that Deputy Lott, Lieutenant Crockett, Officer Craig, and Officer McFarland could all be found liable for excessive force by subjecting Mr. Krueger to a prolonged prone restraint while he was handcuffed. We first discuss whether the officers' use of the prone restraint constituted a constitutional violation, and second, whether that violation is clearly established under our precedent.

### 1.    Constitutional Violation

We have long recognized that the prolonged use of a prone restraint on a subdued suspect constitutes excessive force. In *Weigel v. Broad*, 544 F.3d 1143 (10th Cir. 2008), we held that officers did not act "reasonably" under *Graham* when they placed "pressure . . . on [the decedent's] back as he lay on his stomach . . . once [he] was handcuffed and his legs were bound . . . for three minutes." *Id.* at 1152–53. Similarly, in *Booker*, we found a constitutional violation when an officer "placed an estimated 142.5 pounds—more than [the decedent's] overall weight—on [the decedent's] back while he was handcuffed on his stomach." 745 F.3d at 424; *see also Waters v. Coleman*, 632 F. App'x 431, 441 (10th Cir. 2015) (unpublished) (applying *Weigel* and holding that officer who "continued to restrain [the decedent's] legs, while he was in a prone position, for several minutes after he was handcuffed" used excessive force).

Defendants argue that these precedents do not apply because the district court found that Mr. Krueger was struggling for the entire encounter. But as discussed

63

above, a cumbersome review of the record shows that based on the facts presented at summary judgment, a reasonable jury could conclude that Mr. Krueger was not meaningfully moving, resisting, or struggling throughout the prone restraint.

Moreover, our cases holding that prolonged prone restraints constitute excessive force focus on the ability of the suspect to *effectively* resist, not whether that suspect is struggling or resisting at all. For example, in *Weigel*, our analysis rested on the fact that "there [wa]s evidence that [the decedent] was subjected to such pressure for a significant period after it was clear that the pressure was unnecessary to restrain him," because he "was handcuffed and his legs were bound." 544 F.3d at 1152. This was so even though he was exhibiting "bizarre behavior" and mounting a "vigorous struggle." *Id.* In fact, the decedent's "bizarre behavior[] and vigorous struggle" is what "made him a strong candidate for positional asphyxiation," which contributed to our conclusion that a reasonable officer would have known that "the pressure placed on [the decedent's] upper back as he lay on his stomach created a significant risk of asphyxiation and death." *Id.*

Similarly, in *Lynch v. Board of County Commissioners of Muskogee County, Oklahoma*, 786 F. App'x 774 (10th Cir. 2019), applying *Weigel*, we held officers used excessive force on a decedent even though he continued to "actively resist[] arrest" by "continu[ing] to struggle and hurl insults at the officers" while he was subject to a prolonged prone restraint. *Id.* at 780, 782. We explained that "he did not 'pose[] an immediate threat to the safety of the officers or others' because his arms and legs were shackled," and his resistance no longer weighed heavily because "it

64

was no longer possible for him to flee" due to the restraints. *Id.* at 782 (quoting

*Graham*, 490 U.S. at 396).

And recently, in *Teetz ex rel. Lofton v. Stepien*, 142 F.4th 705 (10th Cir. 2025),

we held that the defendants used excessive force when they "put [the decedent] in leg

restraints and [held] him down in the prone position for a prolonged period of time."

*Id.* at 723. We further observed that "the use of prone restraint—even where a

suspect is 'resisting' to some degree—becomes unreasonable where officers become

aware the suspect is experiencing life-threatening harm but nonetheless continue to

apply the restraint." *Id.* at 728 (quoting *Lombardo v. City of St. Louis*, 594 U.S. 464,

470 (2021) (Alito, J., dissenting)). We further noted that "as we have recognized

since *Weigel*, this can be true even when a suspect fights back at the beginning of an

encounter, or struggles after restraints are placed," as long as the suspect is

effectively restrained while the force is continuously applied. *Id.* (citing *Weigel*, 544

F.3d at 1149, 1153).[20]

Here, the first *Graham* factor—the severity of the crime—weighs in the

Defendants' favor because they reasonably suspected Mr. Krueger of a felony for

---

[20] To be sure, enough time must pass for officers to be able to reassess a situation and determine a suspect has been restrained or subdued. *Compare Est. of Smart v. City of Wichita*, 951 F.3d 1161, 1175 (10th Cir. 2020) (holding "a reasonable jury could conclude [the officer] shot [the plaintiff] *after* it became clear [the decedent] no longer posed a threat" (emphasis added)) *with Est. of Valverde v. Dodge*, 967 F.3d 1049, 1062–63 (10th Cir. 2020) (holding "no jury could doubt that [the officer] made his decision to fire before he could have realized that [the decedent] was surrendering"). Whether sufficient time has passed for officers to reassess a situation is a fact-intensive inquiry that must take into account what a reasonable officer on the scene would perceive.

striking the officers. But the other two *Graham* factors—immediate threat to officer safety and resisting arrest—weigh heavily in the Estate's favor. *See Vette*, 989 F.3d at 1170 (explaining that even where first *Graham* factor weighs in law enforcement's favor, where "remaining factors weigh . . . strongly against significant use of force" a defendant "cannot prevail under the totality of the circumstances").

As discussed, a reasonable jury could find that Mr. Krueger was handcuffed, prone, and subject to a prone restraint that lasted for approximately four minutes. During this time, Officer McFarland rested both his knees on Mr. Krueger's back, Officer Craig put his weight on Mr. Krueger's right shoulder, and at various points Lieutenant Crockett applied weight to his left buttock and thigh, and Deputy Lott put weight on his shoulder. The officers additionally secured leg shackles and a hobble-tie. Even to the extent that Mr. Krueger continued to struggle and kick—and again, a reasonable jury could conclude that he was not meaningfully struggling for most of the encounter—once he was handcuffed, prone, and he had the weight of an officer on him, he no longer "pose[d] an immediate threat to the safety of the officers or others," and any resistance to arrest was outweighed by the fact that he could not "attempt[] to evade arrest by flight." *Graham*, 490 U.S. at 396.[21] Under the totality of

---

[21] As we have recognized and this case illustrates, a prone restraint can constitute deadly force. *See Weigel v. Broad*, 544 F.3d 1143, 1154–55 (10th Cir. 2008) (discussing prone restraints as a form of deadly force); *Teetz*, 142 F.4th at 725–29 (reiterating that prone restraints constitute deadly force). When deadly force is used, we also use the *Estate of Larsen v. Murr*, 511 F.3d 1255 (10th Cir. 2008), subfactors to weigh the immediacy of the threat to law enforcement. *See, e.g.*, *Est. of Valverde*, 967 F.3d at 1061–62 (explaining *Larsen* subfactors can be

the circumstances, a reasonable jury could find that the use of the prone restraint was

not reasonable and therefore constituted excessive force. *See Weigel*, 544 F.3d

at 1152–53 (holding use of prone restraint was unreasonable under *Graham* once it

became unnecessary to restrain decedent and officers determined the danger had

passed).[22]

## 2.    Clearly Established

*Weigel* and *Booker* clearly establish that officers use excessive force when

they apply a prolonged prone restraint and put weight on a suspect's back when that

suspect is handcuffed, is subject to a leg restraint, and is effectively subdued. *See*

*Weigel*, 544 F.3d at 1152–53; *Booker*, 745 F.3d at 424. Mr. Krueger's case fits

comfortably within these parameters: he was handcuffed; subjected to a prone

restraint for at least four minutes; multiple officers put weight on his back, legs, and

---

applied to determine the immediacy of threat facing officers in deadly force cases).
Applying the facts a reasonable jury could find to those subfactors, at this point in the
encounter, Mr. Krueger was compliant because he was prone and unmoving, he was
not making any hostile motions toward the officers, and he was not manifesting any
hostile intentions. *See Larsen*, 511 F.3d at 1260. Thus, the *Larsen* subfactors also
weigh against the continued use of the prone restraint because Mr. Krueger no longer
posed "*a threat of serious physical harm*" to himself or the officers that could justify
deadly force. *Id.*

[22] As we recognized in *Teetz*, "the limited use of a prone restraint to obtain
control of a suspect can be a proper police procedure." 142 F.4th at 726. Thus, where
officers use a prone restraint on a suspect only to the point the suspect is restrained
and then remove the weight, the force used would not be excessive under our
precedents. But where, as here, a reasonable jury could find officers *continued* to use
a prone restraint on a suspect who was handcuffed and with his legs restrained, a jury
could conclude the continued use of the prone restraint was excessive.

shoulders; and his legs were shackled and eventually hobble-tied to his wrists. We have no difficulty concluding that the constitutional violation here—if proved—is clearly established by our case law. We reject Defendants' arguments to the contrary, taking each Defendant's argument in turn.

First, each of the Defendants advances some version of the argument that because the district court found that the *Graham* factors weighed in their favor at the beginning of the encounter, they did not use excessive force. But as discussed, the most important question in an excessive force analysis is not whether force was justified at the beginning of the encounter, but rather, if it remained reasonable under the totality of the circumstances. *See Barnes*, 145 S. Ct. at 1358; *Smart*, 951 F.3d at 1176 (explaining force becomes excessive if an officer has "enough time . . . to recognize and react to the fact that [the suspect] no longer posed a threat" but uses force anyway (internal quotation marks omitted)).

The district court here failed to properly conduct the *Graham* analysis when it analyzed the use of force only at the beginning of the encounter. As discussed above, our cumbersome review of the record indicates that a reasonable jury could find that Mr. Krueger did not resist throughout the encounter. Analysis of the *Graham* factors in light of that fact—considering the totality of the circumstances and the full length of the use of the force—leads to the conclusion that the use of force was excessive.

Accordingly, the district court's conclusion that the *Graham* factors weighed in Defendants' favor at the beginning of the encounter is of no moment.[23]

Second, the City Defendants argue that Mr. Krueger posed an immediate threat and was actively resisting the entire encounter, making *Weigel* inapplicable. *See* City Defs.' Br. at 22–31. Relying heavily on *Giannetti v. City of Stillwater*, 216 F. App'x 756 (10th Cir. 2007) (unpublished), the City Defendants urge that their use of force was reasonable, again assuming that Mr. Krueger struggled the entire encounter. We find this argument unpersuasive. In *Giannetti*, the suspect "*continued* to struggle and kick the officers, at one point sending one officer against a locker" while in a prone restraint. *Id.* at 765 (emphasis added). Because of the suspect's constant and "escalating" opposition, we held the use of force was reasonable. *Id.* at 766. But here, we have determined that the facts—viewed in the light most favorable to the Estate— could show that Mr. Krueger was not meaningfully struggling during much of the prone restraint, and that Mr. Krueger was effectively subdued. Accordingly, we find *Giannetti* inapplicable.[24]

---

[23] Relatedly, some of the Defendants also seem to urge that the district court's *Graham* analysis was a factual finding that cannot be revisited on interlocutory appeal. We disagree; the application of the *Graham* factors to the facts of the case is a quintessential legal question we must resolve on interlocutory review. *See, e.g.*, *Valverde*, 967 F.3d at 1060–61 (explaining the *Graham* factors are legal principles which inform our consideration of the reasonableness of a use of force).

[24] As we recently pointed out in *Teetz*, our statement in *Giannetti v. City of Stillwater*, 216 F. App'x 756 (10th Cir. 2007) (unpublished), that "[r]estraining a person in a prone position is not, *in and of itself*, excessive force when the person restrained is resisting arrest" has been "clarified by later published decisions." 142

Similarly, the City Defendants' argument that the law was not clearly established assumes that they were using "controlling force on a resisting felony suspect." City Defs.' Br. at 31. But as discussed, the facts viewed in the light most favorable to Mr. Krueger are that he did not struggle the entire time and the Defendants gained control over him. This echoes *Weigel*, in which the decedent fought "vigorously" with law enforcement at the beginning of the encounter and even tried to take their weapons, but we still held the prone restraint used on him was excessive once he was under the control of the officers. *See Weigel*, 544 F.3d at 1148, 1152–53.

Third, the County Defendants argue that Deputy Lott did not use excessive force because "case law does not clearly establish that [Deputy Lott's] contact with Mr. Krueger's right shoulder could be excessive force." Cnty. Defs.' Br. at 39. While conceding that Deputy Lott put his foot on Mr. Krueger's shoulder during the group prone restraint, the County Defendants assert that Deputy Lott did not "put[] substantial or significant pressure on a suspect's back while that suspect is in a face-down prone position after being subdued." *Id.* at 41 (quoting *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 903 (6th Cir. 2004)). The County Defendants, like the

---

F.4th at 730 n.7. For example, in *Weigel*, we held that "applying pressure to [a suspect's] upper back, *once he was handcuffed and his legs restrained*, was constitutionally unreasonable due to the significant risk of positional asphyxiation associated with such actions." 544 F.3d at 1155 (emphasis added). And in *Booker*, we reiterated that "putting substantial or significant pressure on a suspect's back while that suspect is in a face-down prone position after being subdued and/or incapacitated constitutes excessive force." 745 F.3d at 424 (internal quotation marks omitted).

City Defendants, also argue that Mr. Krueger was resistant the entire time. *Id.* at 41–43. But as discussed above, the facts at summary judgment support a finding that Deputy Lott put his foot on Mr. Krueger's shoulder while he was prone, handcuffed, effectively restrained, and no longer meaningfully resisting. Moreover, while Deputy Lott asserts he did not put significant weight on Mr. Krueger's shoulder, the district court found that the video could support the Estate's assertion that Deputy Lott did put significant weight on Mr. Krueger for up to a minute. His participation in the prone restraint is enough to subject him to liability. *See Weigel*, 544 F.3d at 1152–53.

Indeed, our precedent clearly establishes that an officer need not be the one directly putting weight on a suspect's back for his involvement to be clearly established as excessive. In *Weigel*, we held two highway troopers could be liable for excessive force in applying a prone restraint: one who "applied pressure to [the decedent's] upper body, including his neck and *shoulders*," and another who "straddled [the decedent's] upper thighs and buttocks and held [the decedent's] arms in place," and then eventually left the scene while the other remained on the decedent's "upper torso." 544 F.3d at 1148–49 (emphasis added).

Importantly, in *Weigel*, we analyzed both officers' culpability for the prone restraint *together*, even though one trooper "was in his car when [the decedent] went

71

into cardiac arrest." *Id.* at 1153 n.4.[25] Similarly, in *Booker*, we held five officers who "actively participated in a coordinated use of force" on the decedent could be liable, explaining that "[i]f excessive force occurred, all deputies contributed to it." 745 F.3d at 422. We explained that each defendant who actively participated in excessive force as part of a "group effort" was liable for any underlying finding of excessive force. *Id.* Thus, *Weigel* and *Booker* put Deputy Lott on notice that his participation—specifically, putting weight on a suspect's shoulders as part of a prone restraint—renders him subject to liability for excessive force, even if he was not the officer putting the most weight on Mr. Krueger's back.

Fourth, Lieutenant Crockett similarly argues that because she engaged in only "minor and brief use of force in restraining [Mr. Krueger's] legs," she did not use excessive force. Crockett Br. at 23. We disagree. As discussed, in *Weigel*, a trooper could be liable for excessive force when he participated in a prone restraint by "straddl[ing] [the decedent's] upper thighs and buttocks and [holding the decedent's] arms in place," even though he then left to go "to his vehicle to warm his hands" while one trooper and one bystander continued to apply weight to the decedent's back and legs. 544 F.3d at 1148–49. We held that both troopers should have known they "subjected [the decedent] to force that they knew was unnecessary to restrain

---

[25] We further recognized that the officer who left the scene could also be liable under a failure to intervene theory. *Weigel*, 544 F.3d at 1153 n.4. *Booker* also acknowledged this possibility in the alternative. 745 F.3d at 422–23. We discuss the failure to intervene claim separately, *see infra* Section IV.C.

him," constituting excessive force, and we held that each trooper could be liable even though one trooper "was in his car when [the decedent] went into cardiac arrest." *Id.* at 1152–53 & n.4.[26]

Here too, Lieutenant Crockett put weight on Mr. Krueger's thigh and buttock while assisting with the placement of a leg restraint while another officer put weight on Mr. Krueger's back. Then, she left to go to her car even while other officers continued to apply weight to the prone Mr. Krueger. She was in her car when Mr. Krueger's breathing slowed and the EMTs were called. These facts are so strikingly similar to *Weigel* it is hard to imagine a case that could have put Lieutenant Crockett on clearer notice that her participation in the prone restraint made her subject to an excessive force claim, even though she was not the officer applying weight to Mr. Krueger's back, and she left the scene to go to her car before the EMTs were alerted that Mr. Krueger may have stopped breathing.[27]

In short, our case law clearly establishes that Defendants' group participation in the prolonged prone restraint of Mr. Krueger could constitute excessive force where he was handcuffed, his legs were shackled, he stopped meaningfully resisting,

---

[26] We discuss *infra* Section IV.C the related possibility that Lieutenant Crockett is liable for failing to intervene in the use of force.

[27] Although not determinative of the clearly established analysis because it is unpublished, *Waters v. Coleman*, 632 F. App'x 431 (10th Cir. 2015) (unpublished), is supportive. There, we applied *Weigel* and held that an officer who restrained a suspect's legs "while he was in a prone position . . . *after* he was handcuffed" was not entitled to qualified immunity. *Id.* at 441.

Defendants were no longer in immediate danger, and Mr. Krueger had no realistic possibility of flight. Because the district court found there were material factual disputes as to the amount of weight each Defendant put on Mr. Krueger, a jury will have to decide whether each Defendant used excessive force. But at summary judgment, especially where each Defendant could also be liable for failing to intervene, *see infra* Section IV.C, the excessive force claims survives the defendants' qualified immunity defense.

### C.    *Failure to Intervene – All Defendants*

The Defendants argue that the district court erred by construing the operative complaint to contain a failure to intervene claim, or that even if properly construed as part of the complaint, the Defendants are entitled to qualified immunity on the claim. For the reasons explained below, we conclude the district court properly construed the complaint as containing a failure to intervene claim and that the facts a jury could find are sufficient to demonstrate a clearly established failure to intervene on the part of each Defendant.

### 1.    Whether the Operative Complaint Contains a Failure to Intervene Claim

We will construe a complaint as containing a failure to intervene claim where a plaintiff's allegations are sufficiently clear to put a defendant on notice they could be liable for failing to intervene in a constitutional violation, even if the claim is not separately pleaded in the complaint. *Fogarty*, 523 F.3d at 1164–65. In *Fogarty*, the plaintiff brought § 1983 claims against six city police department defendants for excessive force and supervisory liability but did not separately bring claims for

failure to intervene. *Id.* at 1153, 1164. In determining that one of the officers could be indirectly liable for excessive force, we explained that "[u]nder this circuit's clearly established law, if [the officer] were indeed present at [the plaintiff]'s arrest with an opportunity to prevent the excessive use of force, he would have had a duty to intervene." *Id.* at 1163. As to that officer's argument that summary judgment should have been granted because the plaintiff had not alleged a separate failure to intervene claim, we explained that the claim did not need to be pleaded separately as long as the plaintiff "ma[d]e clear the grounds on which the plaintiff is entitled to relief." *Id.* at 1164 (quotation marks omitted). We held the plaintiff cleared this bar because "[h]e clearly alleged" that "all defendants . . . used *or permitted* physical force in the course of the arrest." *Id.* at 1165. The "allegations were therefore sufficiently clear to put defendants on notice that the alleged constitutional violations were predicated, in part, on their alleged failure to intervene." *Id.*

By contrast, in a later, nonprecedential decision, we held that allegations in a complaint were not sufficient to put defendants on notice they could be liable under a failure to intervene theory. *See Lynch*, 786 F. App'x at 783. There, the plaintiff argued that a defendant who had not participated in the alleged excessive force could be held liable under a failure to intervene theory, but the "complaint [wa]s focused entirely on the level of force used and nowhere indicate[d] or allege[d] that [the defendant] (or any of the other officers) should have intervened." *Id.*

Here, the operative complaint describes the force inflicted by Deputy Phillips, Deputy Orr, Officer Craig, and Officer McFarland, and then alleges that "[a]t no time

did Deputies Orr or Phillips or Officers Craig or McFarland (*and other named defendants* above, though the exact ones are unknown at this time) *stop their use of excessive force* on Mr. Krueger after he asked for help and said he couldn't breathe, nor did they or [the] EMTs . . . (*and other named defendants above*, though the exact ones are unknown at this time) render medical aid or care to *or assist Mr. Krueger* with his cries for help." App. Vol. I at 277 (emphases added). The district court acknowledged it was not "abundantly clear" from these allegations that the Estate intended to bring a separate failure to intervene claim, but held that under *Fogarty*, these allegations sufficiently put Defendants on notice that the Estate sought to hold them liable on a failure to intervene theory in the alternative to excessive force. App. Vol. VIII at 2107. Just as the complaint in *Fogarty* alleged that the defendants "used or *permitted* physical force," 523 F.3d at 1165 (emphasis added), the complaint here alleged that all Defendants failed to "stop [Deputy Orr's, Deputy Phillips's, Officer McFarland's or Officer Craig's] use of excessive force," App. Vol. I at 277.

And even if those allegations were not sufficient, the previous paragraph in the complaint—targeted to defendants not party to this appeal—specifically noted that "[a]ll state actors have a duty to intervene and stop the use of excessive force." *Id.* at 276. The paragraph also cites case law on failure to intervene liability. *See id.* at 276–77. By citing that precedent and then, in the following paragraph, specifically alleging that all Defendants failed to assist Mr. Krueger, the Estate sufficiently put the Defendants on notice that the complaint sought liability both for excessive force and for failing to intervene to stop excessive force. *See Fogarty*, 523 F.3d at 1164–

76

65. Moreover, the City Defendants and Deputy Lott apparently understood the Estate was pursuing such a claim because they argued at summary judgment that they are not liable for failing to intervene. Thus, they were not prejudiced by the district court construing the complaint as containing a failure to intervene claim.

In contrast, Lieutenant Crockett argues she is prejudiced by construing the operative complaint as containing a failure to intervene claim because she did not address failure to intervene in her opening summary judgment brief. But early in the litigation and well before the summary judgment motions, the district court issued an order denying in part a motion to dismiss in which it construed the complaint as containing a failure to intervene claim. This was sufficiently early in the litigation to put all Defendants on notice of the claim.

In light of this procedural history and the language in the operative complaint, Defendants were sufficiently on notice of, and the district court correctly construed the complaint as containing, a failure to intervene claim.

2.    **Merits of Failure to Intervene Claim**

Having concluded the district court properly construed the operative complaint as containing a failure to intervene claim, we turn to the merits of Defendants' arguments.

We have explained that "even if a single deputy's use of force was not excessive, a law enforcement official who fails to intervene to prevent another law enforcement official's use of excessive force may be liable under § 1983." *Booker*, 745 F.3d at 422 (internal quotation marks omitted). This is true even where the

officer does not "actually participate in the use of excessive force," so long as the officer is "present at the scene and . . . fails to take reasonable steps to protect the victim of another officer's use of excessive force." *Mascorro v. Billings*, 656 F.3d 1198, 1204 n.5 (10th Cir. 2011). Thus, in *Fogarty*, we affirmed the denial of qualified immunity as to a failure to intervene claim where the defendant was present during an allegedly unconstitutional arrest. 523 F.3d at 1164. And in *Booker*, where the "[p]laintiffs alleged and the video confirmed that all of the [d]efendants were present and observed the entire use of force over a two-to-three minute period . . . a reasonable jury could find any given defendant here liable for failing to intervene." 745 F.3d at 423–24.

Here, a reasonable jury could find Defendants liable for failing to intervene to stop the use of excessive force against Mr. Krueger.

As to Deputies Phillips and Orr, it is unclear from the record which deputy slammed Mr. Krueger's head into the ground, and whether and how many times each deputy tased Mr. Krueger in drive-stun mode after he was subdued. Each Deputy therefore could be found liable for failing to intervene in the other's act of violence, depending on who the factfinder ultimately determines performed the head slam and taser strikes. Further, having found on our de novo review of the record that Deputies Orr and Phillips both observed the other Defendants' use of the prone restraint on Mr. Krueger, they can also be found liable for not intervening to stop the other Defendants from using excessive force on Mr. Krueger.

As to Officers Nevitt and Blair, Deputy Lott, and Lieutenant Crockett, they can each be found liable for failing to intervene when Officers McFarland and Craig were putting weight on Mr. Krueger's back and shoulders. The district court found there was no factual dispute that Officers Nevitt and Blair were present and witnessed Officers McFarland and Craig on top of Mr. Krueger. And the district court also found that Deputy Lott and Lieutenant Crockett were present because they were involved in the prone restraint. On those facts, under *Booker*, the Defendants were sufficiently "present" and "observ[ing]" the prolonged prone restraint to be liable for failing to intervene in the use of it. 745 F.3d at 423.[28] Additionally, Officers Craig and McFarland are subject to liability for failing to intervene with the other's use of force, as they were both aware of the other's role in the prone restraint.

Finally, it is clearly established under our case law that officers are liable for failing to intervene in the use of excessive force—including specifically excessive taser use and prolonged prone restraints—when they are present on the scene, observe the force taking place, and do not stop it. *Booker*, 745 F.3d at 422–23; *see also Weigel*, 544 F.3d at 1153 n.4 (holding officer also liable under failure to intervene when he left two other officers while they continued a prone restraint on the decedent). Defendants do not dispute this premise is clearly established, nor that they were present during the alleged excessive force. Rather, Defendants' arguments that their failure to intervene was not

---

[28] That Lieutenant Crockett walked away after putting on the leg restraints is irrelevant; the salient fact is that she was on the scene, witnessed Officers McFarland and Craig putting weight on the restrained Mr. Krueger's back, and did not intervene.

79

clearly established all rest on the factual premise that Mr. Krueger was not subdued and was fighting back when they observed the use of force. But having concluded that the facts at summary judgment, viewed in the light most favorable to the Estate, could support a finding that Mr. Krueger was effectively subdued, *Booker* and *Weigel* apply and clearly establish that Defendants failed to intervene in an unconstitutional use of excessive force.

To be sure, law enforcement officers cannot be held liable under a failure to intervene theory for constitutional violations they are not aware of, particularly if they arrive to a scene after pertinent events have taken place. *See Jones v. Norton*, 809 F.3d 564, 576 (10th Cir. 2015) ("In order to be liable for failure to intervene, the officers must have observe[d] or ha[d] reason to know of a constitutional violation and have had a realistic opportunity to intervene." (internal quotation marks omitted)). Under this principle, there was not enough evidence in this record to impute to the late-arriving officers' knowledge of Mr. Krueger's behavior suggesting possible intoxication at the gas station, or his conduct before removal from the vehicle. But where each Defendant either directly participated in the use of force against Mr. Krueger after he was on the ground, or—in the case of Officers Blair and Nevitt—testified they directly observed the prone restraint but did nothing to stop it, our precedent unquestionably provides that their failure to intervene in an unconstitutional use of force subjects them to possible liability for the excessive force.

The district court correctly determined that the Defendants are not entitled to qualified immunity on the Estate's failure to intervene claim.

## PART V: CONCLUSION

Although our jurisdiction on interlocutory appeal of the denial of qualified immunity is typically limited to "abstract issues of law," we will review the facts "if a district court fails to specify which factual disputes precluded a grant of summary judgment for qualified immunity," *Booker*, 745 F.3d at 409–10 (quotation marks omitted), if "the version of events the district court holds a reasonable jury could credit is blatantly contradicted by the record," or if the district court "commits *legal* error en route to a *factual* determination," *Teetz*, 142 F.4th at 712 (internal quotation marks omitted). We agree with the parties that the district court's orders denying summary judgment committed a combination of these deficiencies, requiring us to review de novo the facts as to Deputies Phillips and Orr, and to review de novo the level of Mr. Krueger's resistance during the prone restraint enacted by Officers McFarland and Craig, Deputy Lott, and Lieutenant Crockett.

Having conducted a de novo review of these material facts, we agree with the district court's legal conclusions that each Defendant is subject to liability either for using excessive force, for failing to intervene, or both.

First, we agree that Deputies Orr and Phillips are not entitled to qualified immunity as to the excessive force claims. A reasonable jury could conclude that the Deputies forcibly removed Mr. Krueger, a misdemeanant, from his car mere seconds after they arrived on scene and without giving him a chance to comply with

81

commands. The jury could further find that the Deputies held Mr. Krueger at gun point, removed him by his hair, and then slammed him to the ground with enough force to dislodge a chunk of his hair and leave a gash in his head. A reasonable jury could also find that the Deputies next used their tasers on Mr. Krueger in drive-stun mode after he ceased resisting. Because the force the jury could find the Deputies used was clearly established as excessive by our precedents, Deputies Phillips and Orr are not entitled to qualified immunity.

Second, a reasonable jury could conclude that Mr. Krueger was subjected to a prolonged prone restraint, while handcuffed, and that the prone restraint continued after he ceased effectively resisting. The use of a prolonged prone restraint under these circumstances is clearly established as excessive force under our precedents. Accordingly, the district court correctly concluded that the officers who participated in the prolonged prone restraint—Deputy Lott, Lieutenant Crockett, Officer Craig, and Officer McFarland—are likewise not entitled to qualified immunity on the excessive force claim.

Third, the district court correctly construed the operative complaint as containing a failure to intervene claim. The district court also correctly held that each Defendant could be held liable for failure to intervene. Deputies Orr and Phillips are each subject to liability for failing to stop the other's use of excessive force during the first part of the encounter. Deputy Lott, Lieutenant Crockett, and Officers Craig, McFarland, Nevitt, and Blair could each be liable for failing to stop the other officers' participation in the prolonged prone restraint. Because failing to intervene in

these uses of force is clearly established as a constitutional violation, none of the

Defendants are entitled to qualified immunity.

Accordingly, we AFFIRM the district court's order denying Defendants'

motions for summary judgment as to the excessive force and failure to intervene

claims.